UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, JUDGE
--------------------------------------------------------------x
GANTRADE CORP.,                                    :
                                                   :
                        Plaintiff,                 :    Court No. 21-00551
                                                   :
              v.                                   :
                                                   :
UNITED STATES,                                     :
                                                   :
                        Defendant.                 :
                                                   :
--------------------------------------------------------------x


## <u>ORDER</u>

Upon consideration of plaintiff's Motion for Summary Judgment, and all of the pleadings and papers on file herein, and good cause appearing therefor, it is

**ORDERED** that plaintiff's Motion for Summary Judgment be, and hereby is granted; and it is further

**ORDERED** that U.S. Customs and Border Protection shall reliquidate the subject entries under subheading 3404.90.5150, HTSUS, and shall refund the assessed duties with interest as provided by law.


_____
          Leo M. Gordon, Judge


Dated this \_\_ day of _____, 20\_\_
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, JUDGE

```
-------------------------------------------------------------x
GANTRADE CORP.,                            :
                                           :
                     Plaintiff,            :   Court No. 21-00551
                                           :
          v.                               :
                                           :
UNITED STATES,                             :
                                           :
                     Defendant.            :
                                           :
-------------------------------------------------------------x
```

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Gantrade Corp., by its undersigned attorneys and pursuant to United States Court of International Trade Rule 56, respectfully moves for summary judgment. In this action, plaintiff challenges defendant's denial of the protests underlying this action and claims classification for the subject merchandise under subheading 3404.90.51, HTSUS.

Summary judgment is appropriate in this case because there are no genuine outstanding issues of material fact. In support of this motion, plaintiff also submits a Memorandum of Law (together with this motion); a Statement of Material Facts Not in Dispute; Transcript Excerpts from the Deposition of Nicholas Horne; Esq.; a Declaration of Dr. George Kwiatkowski; Excerpts from Defendant's Responses to Interrogatories; a Declaration of Dr. Wade Lanning; Transcript Excerpts from the Deposition of Dr. Hermenegildo Pedrosa; and Transcript Excerpts from the Deposition of Dr. Nicholas Ahlemeyer.

Wherefore, plaintiff respectfully requests this Court to grant its motion and order defendant to reliquidate the subject entries under subheading 3404.90.51, HTSUS, and refund the assessed duties with interest as provided by law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, FL 36
New York, New York 10022
Tel. (212) 557-4000
JSpraragen@gdlsk.com


By:     /s/ Joseph M. Spraragen
        Joseph M. Spraragen
        Matthew A. Seymour

        .
Dated: January 21, 2026
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, JUDGE

------------------------------------------------------------x

GANTRADE CORP.,                  :

                         :

              Plaintiff,     :   Court No. 21-00551

                         :

        v.                  :

                         :

UNITED STATES,            :

                         :

             Defendant.    :

                         :

------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, FL 36
New York, New York 10022
(212) 557-4000

Alan R. Klestadt
Joseph M. Spraragen
Matthew A. Seymour

Dated: January 21, 2026
       New York, New York

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

TARIFF PROVISIONS AT ISSUE .................................................................................. 4

ISSUE OF LAW ................................................................................................................ 5

SUMMARY OF ARGUMENT ......................................................................................... 5

ARGUMENT ..................................................................................................................... 5

    I.    Summary Judgment is Appropriate. ..................................................................... 5

    II.    PTMEG 2000 is an Artificial Wax of Heading 3404. ........................................ 7

        A.    PTMEG 2000 is a Wax. .............................................................................. 7

            1.    GRI 1 Governs the Classification of PTMEG 2000. ................................7

            2.    PTMEG 2000 is an Artificial Wax Pursuant to Note 5 to Chapter 34, HTSUS. .........7

            3.    PTMEG 2000 Fits within Judicial Definitions of "Wax." ..........................8

            4.    *Ejusdem Generis* Directs Classification under Heading 3404, HTSUS. ....................9

            5.    Dictionary and Scientific Authorities Support Classifying PTMEG 2000 as a Wax. ....................................................................................................10

        B.    PTMEG 2000 is an Artificial Product. ..................................................... 12

    III.    The Explanatory Notes do not Preclude Classification under Heading 3404, HTSUS. 12

CONCLUSION.................................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ADC Telecomms., Inc. v. United States*, 916 F.3d 1013 (Fed. Cir. 2019) ...................................... 5

*Adolphe Hurst & Co. v. United States*, 33 C.C.P.A. 96 (U.S. C.C.P.A. 1946) ............................ 9

*Airflow Tech. Inc. v. United States*, 524 F.3d 1287 (Fed. Cir. 2008) .......................................... 13

*Apple Inc. v. United States*, 964 F.3d 1087 (Fed. Cir. 2020) ........................................................ 13

*Archer Daniels Midland Co. v. United States*, 561 F.3d 1308 (Fed. Cir. 2009) .................... 12, 13

*Brookside Veneers, Ltd. v. U.S.*, 847 F.2d. 786 (Fed. Cir. 1988) ................................................ 10

*CamelBak Prods., LLC v. United States*, 649 F.3d 1361 (Fed. Cir. 2011) ................................. 12

*Degussa Corp. v. United States*, 508 F.3d 1044 (Fed. Cir. 2007) ............................................... 12

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ..................................................................................... 11

*JVC Co. of Am. v. United States*, 234 F.3d 1348 (Fed. Cir. 2000) ............................................... 7

*Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed. Cir. 2014) ............................................... 6

*Michael Simon Design, Inc. v. United States*, 501 F.3d 1303 (Fed. Cir. 2007) ........................... 13

*Photonetics, Inc. v. United States*, 33 CIT 1549, 659 F. Supp. 1317 (Ct. Int'l Trade 2009) .......... 6

*Stylo Matchmakers Int'l, Inc. v. United States*, 73 Cust. Ct. 78, C.D. 4556 (1974) ...................... 9

*Universal Electronics. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997) ................................ 6

*Worthington v. Robbins,* 139 U.S. 337 (1891) .............................................................................. 14

**Statutes and Regulations**

28 U.S.C. § 1581 ........................................................................................................................... 2

28 U.S.C. § 2639 ........................................................................................................................... 6

28 U.S.C. § 2640 ....................................................................................................................... 5, 6

Code Me. R. tit. 06-096 Ch. 152 § 2 ............................................................................................ 11

Utah Admin. Code r. R307-357-3 ................................................................................................ 11

**Other Authorities**

Alexander K. Zetzl & Alejandro G. Marangoni, Edible Oleogels (2011) ..................... 10

Collins English Dictionary ................................................................................................. 10

Customs Law & Administration, 3rd Ed. (2019), Vol. 2, § 7:16 ..................................... 9

MERRIAM-WEBSTER DICTIONARY ............................................................................... 10

ULLMANN'S ENCYCLOPEDIA OF INDUSTRIAL CHEMISTRY 515 (6th ed. 2000) .............................. 10

USCIT R. 56 ............................................................................................................... 5

**CBP Rulings**
NY 876960 ................................................................................................................ 8

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, JUDGE

---------------------------------------------------------------x

GANTRADE CORP.,                          :
                                         :
                    Plaintiff,           :    Court No. 21-00551
                                         :
          v.                             :
                                         :
UNITED STATES,                           :
                                         :
                    Defendant.           :
                                         :

---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This case concerns the tariff classification of a Polytetramethylene Ether Glycol 2000 ("PTMEG 2000") under the Harmonized Tariff Schedule of the United States ("HTSUS"). PTMEG 2000 is an artificial wax.

U.S. Customs and Border Protection ("CBP") classified the subject merchandise upon liquidation under subheading 3907.20.00, HTSUS (2019), which provides for "[o]ther polyethers."

Plaintiff Gantrade Corp. ("Gantrade") moves for summary judgment holding that PTMEG 2000 is classifiable under subheading 3404.90.51, HTSUS, as other artificial wax.

The principal issue in this case is whether PTMEG 2000 is an artificial wax within the scope of heading 3404.  If it is, classification under heading 3907, HTSUS, is precluded by operation of Note 2(b) to Chapter 39, HTSUS.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) and there are no genuine issues of material facts to be resolved at trial.

## STATEMENT OF FACTS

Gantrade is an importer, marketer, distributor, and seller of monomers, intermediates, and polymers.  The subject merchandise consists of PTMEG 2000, which is an artificial wax that is a is a polymer of tetrahydrofuran with the empirical formula of $HO(C_4H_8O)_nH$.  Pl.'s Stmt. of Material Facts not in Dispute ("PSMF") ¶¶ 8, 16.  PTMEG 2000 contains carbon, hydrogen, and oxygen.  *Id*. at ¶ 23.  Gantrade imported, marketed and sold the subject PTMEG 2000.  *Id*. at ¶¶ 2, 6, 9.

In its condition upon importation, and at room temperature, PTMEG 2000 is a white, waxy solid.  *Id*. at ¶ 12.  If heated above room temperature, PTMEG 2000 melts to a clear, colorless viscous liquid.  *Id*. at ¶ 13.  PTMEG 2000 is insoluble in water.  *Id*. at ¶ 15.  PTMEG 2000 is malleable when heated. *Id*. at ¶ 14.

PTMEG 2000 is produced by the polymerization of tetrahydrofuran, which is derived from 1,4-butanediol.  *Id*. at ¶ 16.  As such, PTMEG 2000 is an artificial, synthetic product; it is not naturally occurring or derived from naturally occurring substances.  *Id*. at ¶¶ 11, 17.

PTMEG 2000 shares significant characteristics with polyethylene glycol (PEG).  *Id*. at ¶ 21.  PEG is classified in subheading 3404.20, HTSUS.  *Id*.  Both PTMEG 2000 and PEG are linear polyether diols.  *Id*.  Both feature a flexible, uniform backbone structure of carbon chains connected by oxygen atoms.  *Id*.  Both PTMEG 2000 and PEG are waxy solids at room temperature that melt to liquids when heated.  *Id*.

Gantrade markets and sells PTMEG 2000 to customers for use in manufacturing high-performance polyurethanes, polyureas, copolyester and copolyamide elastomers.  *Id*. at ¶¶ 9, 11.

2

The subject merchandise is commercially marketed as a wax. *Id*. at ¶ 10. The product's principal applications are in Spandex elastic fibers, thermoplastic polyurethanes, thermosetting polyurethanes, and castable polyurethane prepolymers and polyureas, which are, in turn, used in a range of products including high performance adhesives, sealants and protective coatings, elastic fibers for sportswear and clothing, wheels and industrial tires, industrial belts and conveyors, medical devices, floor coatings, and molded industrial parts. *Id*. at ¶ 20.

PTMEG 2000 has "supercooling" properties. *Id*. at ¶ 24. This means that after it has been heated to a liquid, it remains in its liquid state and does not crystallize (i.e., return to a fully solid state), unless it is kept at temperatures below room temperature or is kept at room temperature for several hours. *Id*.

Waxes such as PTMEG 2000 are comprised of a mixture of molecules of different molecular weights. *Id*. at ¶ 25. Because the molecules vary in molecular weight, they do not have a single melting point. *Id*. Rather, they turn from solid to liquid over a range of temperatures. *Id*.

At a high level, drop point testing involves heating a solid sample and then measuring the temperature at which the wax "drops" from the testing instrument. *Id*. at ¶ 26. Preparation of the solid sample for drop point testing can vary. *Id*. One preparation method involves 1) heating the wax to the point that it becomes a liquid; and 2) allowing the liquid to return to its solid form. *Id*.

Independent laboratory testing performed by SPL Laboratories determined that PTMEG 2000 has a drop point in excess of 40°C. *Id*. at ¶ 31. Gantrade's expert witness, Dr. Wade Lanning, also conducted drop point testing on PTMEG 2000 in its solid, waxy state, and he found that PTMEG 2000 has a dropping point in excess of 40°C. *Id*. at ¶ 32.

The CBP Laboratory tested a sample of PTMEG 2000 and found a dropping point that was less than 40°C.  *Id*. at ¶ 28.  After heating the sample until it became a liquid, CBP's laboratory allowed the sample to sit for two hours at an unverified room temperature.  *Id*. at ¶ 29. Dr. Lanning conducted drop melting point testing using the methodology asserted to have been used by the CBP Laboratory and concluded that the sample was still in liquid form after two hours.  *Id*. at ¶ 37.  Drop melting is intended to determine the temperature at which the wax begins to turn from a solid to a liquid.  *Id*. at ¶ 26.  However, the CBP Laboratory performed its test on a sample that was already a liquid, invalidating its results.  *Id*. at ¶ 36.

When Dr. Lanning performed testing on PTMEG 2000, and allowed the liquid sample to return to its solid state, he found that PTMEG 2000 has a dropping point in excess of 40°C.  *Id*. at ¶ 32.

## **TARIFF PROVISIONS AT ISSUE**

(citations to 2019 HTSUS)

| **Heading/Subheading** | **Description** |
| --- | --- |
| 3404 | Artificial waxes and prepared waxes: |
| 3404.20.00 | Of poly(oxyethylene) (polyethylene glycol) |
| 3404.90 | Other: |
| 3404.90.51 | Other……………Free |
| | |
| 3907 | Polyacetals, other polyethers and epoxide resins, in primary forms; polycarbonates, alkyd resins, polyallyl esters and other polyesters, in primary forms: |
| 3907.20.00 | Other polyethers…..6.5% |

## ISSUE OF LAW

1.    Is PTMEG 2000 classifiable as an "artificial wax" of heading 3404, HTSUS?

## SUMMARY OF ARGUMENT

The sole issue presented by this case is whether PTMEG 2000 is an artificial wax of heading 3404, HTSUS.  PTMEG 2000 fits squarely within judicial, lexicographic, regulatory, industry, and administrative definitions of "wax."  It is undisputed that PTMEG 2000 is an "artificial" substance.

Defendant has stated for the record that it agrees that PTMEG 2000 is an "artificial wax." Accordingly, there are no material facts in dispute, and the Court should find that PTMEG 2000 is classifiable under subheading 3404.90.51, HTSUS.

## ARGUMENT

**I.  Summary Judgment is Appropriate.**

This Court reviews the denial of a protest *de novo*.  28 U.S.C. § 2640(a)(1).  A grant of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a). This case can be resolved by summary judgment as there are no disputed issues of material facts. The material facts in this case are that PTMEG 2000 is a wax and that it is an artificial wax. Because these material facts are undisputed, this case is suitable for resolution by summary judgment.

What remains is for the Court to determine whether plaintiff is entitled to judgment as a matter of law.  A classification case generally involves a two-step analysis.  *ADC Telecomms., Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019).  In the first step, the Court

5

determines the proper meaning of the terms in the relevant tariff provisions, which is a question of law.  *See Link Snacks, Inc. v. U.S.*, 742 F.3d 962, 965 (Fed. Cir. 2014).  In the second step, the Court determines whether the merchandise at issue properly falls within the description of those terms, which is a question of fact.  *Id.*  "However, when there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'"  *Id.* at 965-66 (citation omitted).

Here, there is no material dispute as to the nature of the subject merchandise. Defendant's Rule 30(b)(6) witness, Nicholas Horne, Esq., of CBP's Office of Trade, Regulations and Rulings Directorate, testified at deposition that "CBP agrees that PTMEG 2000 at issue here is an artificial wax."  PSMF ¶ 8; Horne Tr. at 17:6-18:6.  Because the parties agree that PTMEG 2000 is an artificial wax, there simply is no material fact in dispute.

Accordingly, the classification question before the Court is a question of law.  In such instances, this Court reviews classification cases *de novo*, in accordance with 28 U.S.C. § 2640(a).  *Photonetics, Inc. v. U.S.*, 33 CIT 1549, 1554, 659 F. Supp. 1317, 1321 (Ct. Int'l Trade 2009) (citing *Universal Elecs. Inc. v. U.S.*, 112 F.3d 488, 491-93 (Fed. Cir. 1997).  While a presumption of correctness attaches to CBP's classifications pursuant to 28 U.S.C. § 2639(a)(1), "this presumption 'is irrelevant where there is no factual dispute between the parties.'"  *Id.* at 1553-54 (citations omitted).  Accordingly, since there are no disputed material facts in this case, no deference is due to CBP's classification determination.

6

## II.  PTMEG 2000 is an Artificial Wax of Heading 3404.

### A.  PTMEG 2000 is a Wax.

#### 1.  GRI 1 Governs the Classification of PTMEG 2000.

Classification is governed by the General Rules of Interpretation to the HTSUS (GRIs), which are to be applied sequentially.  *JVC Co. of Am. v. U.S.*, 234 F.3d 1348, 1352 (Fed. Cir. 2000).  Accordingly, the first step in a classification analysis is to apply GRI 1, which provides, in relevant part, that "classification shall be determined according to the terms of the headings and any relative section or chapter notes."  Pursuant to GRI 1, in order to be classifiable under heading 3404, HTSUS, PTMEG 2000 must be a "wax."

If the subject merchandise is a "wax" of heading 3404, HTSUS, it is precluded from defendant's claimed classification under heading 3907, HTSUS, by operation of Note 2(b) to Chapter 39, HTSUS, which provides that Chapter 39 does not cover "[w]axes of heading 2712 or 3404."

#### 2.  PTMEG 2000 is an Artificial Wax Pursuant to Note 5 to Chapter 34, HTSUS.

Note 5 to Chapter 34 specifies the scope of heading 3404, HTSUS, and sets forth the statutory exclusions to classification under that heading.  Note 5 provides as follows:

> 5. In heading 3404, subject to the exclusions provided below, the expression "artificial waxes and prepared waxes" applies only to:
> (a) Chemically produced organic products of a waxy character, whether or not water-soluble;
> (b) Products obtained by mixing different waxes;
> (c) Products of a waxy character with a basis of one or more waxes and containing fats, resins, mineral substances or other materials.
>
> The heading does not apply to:
> (a) Goods of heading 1516, 3402 or 3823 even if having a waxy character;

(b) Unmixed animal waxes or unmixed vegetable waxes, whether or not refined or colored, of heading 1521;
(c) Mineral waxes or similar products of heading 2712, whether or not intermixed or merely colored; or
(d) Waxes mixed with, dispersed in or dissolved in a liquid medium (headings 3405, 3809, etc.).

PTMEG 2000 plainly fits within the scope of heading 3404, as defined by Note 5(a). It is a "chemically produced organic product of a waxy character." *See* PSMF ¶ 18. Not only has defendant admitted that the subject PTMEG 2000 is an artificial wax, but it has also repeatedly admitted that it is a "waxy" substance (e.g., defendant admits that "PTMEG 2000 is a white, waxy solid."). *Id*. at ¶ 12. It is undisputed that PTMEG 2000 is chemically produced. Likewise, the fact that PTMEG 2000 is an "organic product" cannot be contested – defendant's own claimed classification is under a provision for other polyethers, and polyethers are organic compounds.

CBP has previously recognized that Note 5 to Chapter 34 directs that PTMEG 2000 is classifiable under heading 3404. In NY 876960 (Oct. 22, 1992), CBP classified PTMEG 2000 under subheading 3404.90.50, HTSUS, stating that "PTMEG 2000 (polytetramethylene ether glycol) Meet [*sic*] the criteria of wax in Chapter 34, Note 5, definition for 'artificial waxes'."

None of the exclusions set out in Note 5 apply here. Therefore, pursuant to GRI 1, PTMEG 2000 must be classified under heading 3404, HTSUS, in accordance with the terms of Note 5.

### 3.   PTMEG 2000 Fits within Judicial Definitions of "Wax."

It appears that this Court has not previously defined the term "wax" for tariff classification purposes. The U.S. Court of Customs and Patent Appeals (C.C.P.A.), which was the predecessor court to the U.S. Court of Appeals for the Federal Circuit, interpreted the term "waxes," as used in the Tariff Act of 1930, to include the following:

> The waxes of this paragraph are substances which in physical properties resemble beeswax and are mixtures of compounds containing carbon, hydrogen, and oxygen.

*Adolphe Hurst & Co. v. United States*, 33 C.C.P.A. 96, 102 (U.S. C.C.P.A. 1946).

The C.C.P.A.'s interpretation of the term "waxes" broadly includes substances that resemble the physical properties of beeswax.  Like beeswax, PTMEG 2000 is a solid at room temperature.  PSMF ¶ 14.  It becomes malleable when heated prior to reaching a full liquid state, like beeswax.  *Id.*  And, like beeswax, it becomes a liquid when sufficiently heated.  *Id.*

Most significantly, PTMEG 2000 consists of "compounds containing carbon, hydrogen, and oxygen" within the definition set forth in *Adolphe Hurst*.  *See* 33 C.C.P.A. at 102.

### 4.  *Ejusdem Generis* Directs Classification under Heading 3404, HTSUS.

*Ejusdem generis* is a rule of statutory construction which provides that where particular words of description are followed by general terms, the latter will be regarded as referring to things of a like class with those particularly described.  *See* Customs Law & Administration, 3rd Ed. (2019), Vol. 2, § 7:16.  As an example of this rule, in *Stylo Matchmakers Int'l, Inc. v. United States*, 73 Cust. Ct. 78, C.D. 4556 (1974), the court classified waterproof golf shoes in an "other" provision, where the superior heading covered specific articles of footwear (other than golf shoes) that shared characteristics with the golf shoes under consideration.

Here, plaintiff claims that the appropriate subheading for PTMEG 2000 is subheading 3404.90, HTSUS.  The superior subheading to subheading 3404.90, HTSUS, is subheading 3404.20.00, HTSUS, which covers artificial waxes of poly(oxyethylene) (polyethylene glycol).  Polyethylene glycol (PEG) shares significant characteristics with PTMEG 2000.  PSMF ¶ 21.  Both are linear polyether diols.  *Id.*  They both feature a flexible, uniform backbone structure of

carbon chains connected by oxygen atoms. *Id*. Additionally, both PEG and PTMEG 2000 are

waxy solids at room temperature that melt to liquids when heated. *Id*.

Accordingly, based upon the shared characteristics of PEG and PTMEG, PTMEG 2000

should be classified under subheading 3404.90, HTSUS, under the rule of e*jusdem generis*.

### 5. <u>Dictionary and Scientific Authorities Support Classifying PTMEG 2000 as a Wax.</u>

Courts frequently refer to common meanings and authoritative sources such as dictionary

definitions to discern the meaning of tariff terms. *See, e.g., Brookside Veneers, Ltd. v. U.S.*, 847

F.2d. 786, 789 (Fed. Cir. 1988) ("To assist it in ascertaining the common meaning of a tariff

term, the court may rely upon its own understanding of the terms used, and it may consult

lexicographic and scientific authorities, dictionaries, and other reliable information sources.").

Dictionary definitions of "waxes" tend to be broad and generally cover a wide range of

substances. At its most basic level, waxes have been characterized as any pliable material that

may be easily molded or impressionable. *See, e.g., Wax*, COLLINS ENGLISH DICTIONARY,

https://www.collinsdictionary.com/us/dictionary/english/wax (last visited Jan. 9, 2026); *Wax*,

MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/wax (last

visited Jan. 9, 2026). Within the chemical industry, waxes have been defined as a "fatty material

that consists of a long hydrocarbon chain, with or without a functional group. Common

functional groups found in waxes include alcohol, ketone, aldehyde, and ester." ALEXANDER K.

ZETZL & ALEJANDRO G. MARANGONI, EDIBLE OLEOGELS (2011). That said, within the field of

industrial chemistry, a generally accepted definition of waxes does not exist, which is a testament

to the term's broad applicability across various fields. U. Wolfmeier et al., *Waxes*, in

ULLMANN'S ENCYCLOPEDIA OF INDUSTRIAL CHEMISTRY 515 (6th ed. 2000). Paraphrasing the

late Justice Stewart, when it comes to waxes, you know it when you see it. *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

PTMEG 2000 fits comfortably within these broad definitions of waxes. At its most basic level, PTMEG 2000 is pliable waxy substance that is malleable. PSMF ¶ 14. Chemically, PTMEG 2000 features a long hydrocarbon chain and a functional group, which are staples of waxes. *Id*. at ¶ 22. Further, based on its mechanical and physical properties, it is properly characterized as a wax. PTMEG 2000 is a waxy opaque substance that is malleable once heated and melts to a clear colorless liquid when sufficiently heated, all properties common to waxes. *Id*. at ¶ 14.

At the regulatory level, states including Maine and Utah, through their environmental protection administrative codes, have similarly provided a broad definition of waxes:

> "Wax" means a material or synthetic thermoplastic substance generally of high molecular weight hydrocarbons or high molecular weight esters of fatty acids or alcohols, except glycerol and high polymers (plastics). "Wax" includes, but is not limited to, substances derived from the secretions of plants and animals such as carnauba wax and beeswax, substances of a mineral origin such as ozocerite and paraffin, and synthetic polymers such as polyethylene.

Code Me. R. tit. 06-096 Ch. 152 § 2; Utah Admin. Code r. R307-357-3. PTMEG 2000 is similarly covered by this broad definition. PTMEG 2000 is an artificial, synthetic wax that features a long hydrocarbon chain and is characterized as a synthetic polymer. PSMF ¶¶ 8, 22.

Here, plaintiff's claim that PTMEG 2000 is an artificial, synthetic wax is supported by the breadth of the common meaning of the term. PTMEG 2000 is malleable when heated, comprised of a long hydrocarbon chain, and features a functional group.

**B.  PTMEG 2000 is an Artificial Product.**

Having established that PTMEG 2000 is a wax, in accordance with the terms of the heading and the relevant chapter note, it remains to establish that the subject merchandise is artificial.  This second material fact is not in dispute.

PTMEG 2000 is an artificial product that is derived from substances that are not naturally occurring.  PSMF ¶¶ 8, 11, 17.  Defendant has agreed that PTMEG 2000 "is an artificial article." *Id.*; Horne Tr. at 38:9-15.

Because it is undisputed that PTMEG 2000 is an artificial product, it is clear that not only is PTMEG 2000 a wax, it is an artificial wax, squarely within the terms of heading 3404, as clarified by Note 5 to Chapter 34, HTSUS.

**III. The Explanatory Notes do not Preclude Classification under Heading 3404, HTSUS.**

Heading 3404, HTSUS is an *eo nomine* provision, which specifically provides for "[a]rtificial waxes."  Since it is an *eo nomine* provision, heading 3404, HTSUS, covers all forms of "artificial waxes."  *See CamelBak Prods., LLC v. U.S.*, 649 F.3d 1361, 1364-65 (Fed. Cir. 2011) (internal citation omitted) ("Absent limitation or contrary legislative intent, an *eo nomine* provision 'include[s] all forms of the named article[,]' even improved forms.").

As the U.S. Court of Appeals for the Federal Circuit (CAFC) has noted, while the *Harmonized Commodity Description and Coding System, Explanatory Notes* ("ENs"), "may be generally useful as guides to the scope of unclear HTSUS headings, they 'are not legally binding.'"  *Archer Daniels Midland Co. v. United States*, 561 F.3d 1308, 1315 (Fed. Cir. 2009) (quoting *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007)).  In *Archer Daniels*, the CAFC considered whether deodorizer distillate (DOD) was classified under

12

subheading 3825.90, HTSUS, as a "residual product."  The court noted that the DOD was

unquestionably within the scope of the ordinary meaning of "residual products."  *Id*. at 1314.

Notwithstanding the plain language of the tariff, the Government in that case had argued against

classification under subheading 3825.90, HTSUS, on the basis that the ENs to that subheading

appeared to limit that provision to four enumerated articles.  Tellingly, the CAFC stated that

"even if the Explanatory Note did contain express language purporting to make it a complete and

exhaustive list of all 'residual products of the chemical or allied industries, not elsewhere

specified or included,' it would not serve to exclude DOD from the scope of subheading

3825.90."  *Id*. at 1315.  In support of its holding, the court cited to *Airflow Tech. Inc. v. United*

*States*, 524 F.3d 1287, 1293 (Fed. Cir. 2008), which similarly held that "when the language of

the tariff provision is unambiguous and the Explanatory Notes contradictory, we do not afford

the Explanatory Notes any weight."  *Id*.[1]  In other words, when the statutory language of a tariff

provision is clear and unambiguous, it would be inappropriate to apply limitations that appear

only in the ENs.

Here, the terms of heading 3404 are clear and unambiguous.  Just as how the Court in

*Archer Daniels Midland* found that DOD was within the ordinary meaning of the term "residual

products," the Court should find that PTMEG 2000 is within the ordinary meaning of the term

"artificial waxes."  Potentially exclusionary ENs should not be given weight in light of the

statute's clear language.  The case for applying GRI 1 and maintaining focus of the terms of the

---

[1] *See also Michael Simon Design, Inc. v. United States*, 501 F.3d 1303, 1307 (Fed. Cir. 2007)
(stating that "because the tariff provision is unambiguous and the Explanatory Notes are contrary
to our precedent, we do not afford them any weight."); *Apple Inc. v. United States*, 964 F.3d
1087, 1095 (Fed. Cir. 2020) (holding that the ENs "cannot create an exception to an HTSUS
heading.").

HTSUS is even stronger here, being that there is a statutory note, Note 5 to Chapter 34, that expressly defines the terms and scope of heading 3404.  To the extent that the ENs deviate from the statutorily defined scope of the heading, the ENs should not be given effect.

The ENs to heading 3404 contain a number of interpretive characteristics of artificial waxes.  One enumerated characteristic found in the ENs is that artificial waxes have a dropping point above 40°C.  Defendant has stated that its sole basis for denying plaintiff's claim that PTMEG 2000 is classified under subheading 3404.90.51, HTSUS, is based upon the CBP Laboratory's finding that a product sample that it tested had a drop melting point lower than 40°C.  Horne Tr. at 23:7-10.

As explained above, this characteristic should not be given any legal effect being that the statutory terms of the heading are unambiguous and Note 5 to Chapter 34 contains no such limitation, and defendant has agreed that PTMEG 2000 is an "artificial wax."  For this reason, there are no disputed material facts in this case and summary judgment is appropriate.[2]

Were the Court to determine that the dropping point of PTMEG 2000 is a material fact, presumably the Court would not grant a motion for summary judgment, being that the dropping point of the subject merchandise is not agreed upon by the parties.

However, if this case were to go to trial, it would not present a typical battle of competing laboratory test results.  Plaintiff is unlikely to contest whether the CBP Laboratory technician

---

[2] As addressed *infra*, dropping point testing entails heating the wax until it reaches a liquid state. It is a well-established principle of customs law that "the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported."  *Worthington v. Robbins,* 139 U.S. 337, 341 (1891).  The fact that the subject merchandise is imported in its solid form is yet another reason why this characteristic from the ENs should not be applied here.

who tested a sample of the subject merchandise followed the dropping point test methodology that he was instructed to use.

At a high level, drop point testing involves heating a solid sample and then measuring the temperature at which the wax "drops" from the testing instrument.  PSMF ¶ 26.  Preparation of the solid sample for drop point testing can vary.  *Id*.  One preparation method involves 1) heating the wax to the point that it becomes a liquid; and 2) allowing the liquid to return to its solid form. *Id*.

It is axiomatic that a wax needs to be in its fully solid state before it is possible to ascertain the temperature at which it transforms from a solid to a liquid.  *Id*. at ¶¶ 38, 41. PTMEG 2000 has "supercooling" characteristics, meaning that it only crystallizes, i.e., returns from its liquid form to its fully solid state, when held at a low temperature or after sitting at room temperature for several hours.  *Id*. at ¶ 24.

Plaintiff would introduce testimony from its expert witness, Dr. Wade Lanning, who has specialized experience and expertise in testing waxes, particularly in regard to thermodynamics and kinetics of phase transformations, such as when a wax transforms from a solid to a liquid.

The CBP Laboratory used the test method ASTM D3954 to test a sample of the subject merchandise.  *Id*. at ¶ 27.  Under ASTM D3954, the sample is heated until it becomes a liquid. Once in its liquid state, the sample is poured in a cup and held at room temperature for two hours.  The sample is then heated, and the dropping point is ascertained by means of a device manufactured by Mettler-Toledo.[3]

---

[3] Mettler-Toledo's instruction manual for this device recommends that the sample be chilled and in a fully solidified state prior to testing.  *Id*. at ¶ 34.

Dr. Lanning would testify that after the sample was heated to the point at which it transformed to a liquid state, it would remain in a liquid state after sitting at room temperature for two hours. *Id*. at ¶ 37. Due to its supercooling properties, it is impossible that the PTMEG 2000 would have returned to a fully solid state after sitting at room temperature for only two hours. *Id*. at ¶ 36. Dr. Lanning repeatedly attempted to replicate the testing performed by the CBP Laboratory. *Id*. at ¶¶ 40, 42. In each attempt, the sample, after having been heated to its liquid state, remained a liquid after being held for two hours at room temperature. *Id*. at ¶ 36. Accordingly, the CBP Laboratory results are not valid because they cannot be reproduced. *Id*. at ¶ 42. Essentially, the CBP Laboratory attempted to test the dropping point of a sample that was already in liquid form when it was heated prior to testing. *Id*. at ¶ 37.

Dr. Lanning would also testify that when he tested PTMEG 2000 in its solid, waxy state, he found that its dropping point is in excess of 40°C, consistent with the findings of the independent laboratories that tested the product. *Id*. at ¶ 32.

Defendant's expert witness, Dr. Nicolas Ahelmeyer, did not perform dropping point testing on PTMEG 2000. Ex. 6 (Ahlemeyer Tr.) at 17:8-17. In fact, he had never performed dropping point or any other testing on the physical properties of waxes. *Id*. However, based on his expertise as a chemist, Dr. Ahelmeyer confirmed that a wax would need to be in its crystallized, solid state before it could be tested. *Id*. at 16:7-22. Dr. Ahelmeyer also testified that in his expert opinion, PTMEG 2000 is a synthetic wax. *Id*. at 21:15–23:3.

## CONCLUSION

PTMEG 2000 is an artificial wax within the unambiguous language of heading 3404, HTSUS, as defined by Note 5 to Chapter 34.  The subject merchandise is plainly an artificial wax in accordance with dictionary definitions and scientific sources.  Defendant, and its expert witness have agreed that PTMEG 2000 is an artificial wax.  Within heading 3404, HTSUS, subheading 3404.90.51, HTSUS, is appropriate because the superior subheading covering polyethylene glycol is inapposite.  There are no disputed material facts, and the Court should find that PTMEG 2000 is classified under subheading 3404.90.51, HTSUS.

For the foregoing reasons, plaintiff respectfully requests that the Court grant its motion for summary judgment and order CBP to reliquidate the subject entries with classification of the subject merchandise under subheading 3404.90.51, HTSUS, and to refund the excess duties paid with interest as provided by law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, FL 36
New York, New York 10022
Tel. (212) 557-4000
JSpraragen@gdlsk.com

By:    /s/ Joseph M. Spraragen
          Joseph M. Spraragen
          Matthew A. Seymour

Dated:  January 21, 2026
           New York, New York

## CERTIFICATE OF COMPLIANCE

Pursuant to USCIT Standard Chambers Procedures Rule 2(B), I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 4,683 words including text, headings, footnotes, and quotations.  This word count is within the limit of 14,000 words set forth in Rule 2(B).

/s/ Joseph M. Spraragen
Joseph M. Spraragen
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
599 Lexington Ave., FL 36
New York, New York 10022

Dated: January 21, 2026
        New York, New York

18