UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP, JUDGE

---------------------------------------------------------------x

GANTRADE CORP.,

Plaintiff,

v.

UNITED STATES,

Defendant.

---------------------------------------------------------------x

Court No. 21-00551

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, FL 36
New York, New York 10022
(212) 557-4000

Alan R. Klestadt
Joseph M. Spraragen
Matthew A. Seymour

Dated: September 14, 2026
New York, New York

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

I. PTMEG 2000 is an Artificial Wax of Heading 3404 under the Governing Rules of Tariff Classification........................................................................................................ 2

A. Note 5 to Chapter 34 Directs Classification under Heading 3404................................. 2

B. Classification under Heading 3404 is not Dependent on Dictionary Definitions........... 4

C. The Explanatory Notes Cannot Supersede Chapter Note 5.......................................... 5

D. Defendant Admitted that PTMEG 2000 is Artificial Wax for Tariff Purposes............. 7

II. The Court Should Exclude Portions of Dr. Ahlemeyer's Declaration............................... 8

III. Dr. Lanning's Testimony is Admissible. ........................................................................ 12

A. ASTM D566 is a Reliable Test Methodology ............................................................ 13

B. Dr. Lanning's Testimony Would be Helpful to the Court. .......................................... 15

IV. PTMEG 2000 is not Classifiable under Heading 3907, HTSUS. .................................... 16

CONCLUSION........................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*American Sporting Goods v. United States*, 24 CIT 1156 (2000) .................................................. 9

*Archer Daniels Midland Co. v. United States*, 561 F.3d 1308 (Fed. Cir. 2009)......................... 5, 6

*Aves. In Leather, Inc. v. United States*, 423 F.3d 1326 (Fed. Cir. 2005) ....................................... 3

*Brainard v. American Skandia Life Assur. Corp.*, 2004 WL 5550483 (N.D. Ohio 2005) ............ 9

*Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655 (6th Cir. 2005) .......................... 9

*CamelBak Prods., LLC v. U.S.*, 649 F.3d 1361 (Fed. Cir. 2011)................................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...................... 12, 13, 14, 16

*Deckers Outdoor Corp. v. United States*, 714 F.3d 1363 (Fed. Cir. 2013) ................................. 17

*Franconero v. UMG Recordings, Inc.*, 542 Fed. Appx. 14 (2d. Cir. 2013)................................. 10

*G.G. Marck & Associates, Inc. v. United States*, 2015 WL 3757040 (Ct. Int'l Trade June 17, 2015) ........................................................................................................................... 15

*GRK Canada, Ltd. v. United States*, 761 F.3d 1354 (Fed. Cir. 2014) ............................................ 8

*Janex Corp. v. United States*, 80 Cust. Ct. 146 (1978) ............................................................. 18

*Jing Mei Auto. (USA) v. United States*, 682 F. Supp. 3d 1354 (Ct. Int'l Trade 2023)................. 18

*Key v. Qualcomm Inc.*, 129 F.4th 1129 (9th Cir. 2025)............................................................. 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................... 12

*Lemans Corp. v. United States*, 660 F.3d 1311 (Fed. Cir. 2011)................................................... 5

*Libas, Ltd. v. United States*, 193 F.3d 1361 (Fed. Cir. 1999) ............................................... 13, 14

*National Advanced Systems v. United States*, 26 F.3d 1107 (Fed. Cir. 1994)............................... 7

*Rollerblade, Inc. v. United States*, 112 F.3d 481 (Fed. Cir. 1997) ................................................ 6

*Simod Am. Corp. v. United States*, 872 F.2d 1572 (Fed. Cir. 1989).............................................. 6

*Sony Electronics, Inc. v. United States*, 37 C.I.T. 1748 (2013) ................................................... 18

*The Pomeroy Collection, Ltd. v. United States*, 559 F. Supp. 2d 1374 (Ct. Int'l Trade 2008)....... 3

*United States v. Carborundum*, 63 CCPA 98 (1976) ................................................................... 8

*United States v. Quon Quon*, 46 CCPA 70, (1959) .......... 8

*Worthington v. Robbins*, 139 U.S. 337 (1891).......... 18

**Other Authorities**

*Amendments to Fed. R. Civ. P. 4*, 146 F.R.D. 401 (1993).......... 9

ASTM D566-97, *Standard Test Method for Dropping Point of Lubricating Grease* (1997)....... 14

Federal Rule of Evidence 702.......... 12, 16

USCIT R. 26 .......... 8, 9, 10, 13

USCIT R. 37 .......... 2, 10, 11, 13

**Rulings**

NY N297602 (June 28, 2018).......... 17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP, JUDGE

| | | |
|---|---|---|
| GANTRADE CORP., | : | |
| Plaintiff, | : | Court No. 21-00551 |
| v. | : | |
| UNITED STATES, | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The parties appear to agree that this case can be resolved by means of summary judgment. The parties also agree that the threshold question in this case is whether the subject merchandise, PTMEG 2000, is an artificial wax of heading 3404, Harmonized Tariff Schedule of the United States ("HTSUS").

Plaintiff concurs that defendant has correctly set out the legal framework for determining the answer to this threshold question. The parties diverge on the proper resolution of this question because defendant has not applied the legal framework that it aptly cited. Specifically, defendant glosses over Note 5 to Chapter 34, HTSUS. That note delineates the parameters of "artificial waxes" of Chapter 34, and PTMEG 2000 is clearly an artificial wax within the scope of that tariff term as set forth in Note 5.

Defendant sidesteps the fact that its Rule 30(b)(6) witness testified at deposition that "CBP agrees that PTMEG 2000 at issue here is an artificial wax." PTMEG 2000 is indeed an artificial wax, as that term is defined by the tariff itself.

Defendant's cross-motion heavily relies upon the declaration of its expert witness. That declaration is replete with new opinions and statements that do not appear in the expert report supplied by defendant, and which were not provided by defendant in a supplemental report during discovery. These new opinions and statements should be excluded by the Court pursuant to USCIT R. 37(c)(1).

Plaintiff's expert witness, Dr. Wade Lanning, has specialized expertise germane to the analysis of when a wax undergoes a phase transformation from a solid to a liquid. His testing and observations of the subject merchandise, as well as his application of scientific principles and methods would assist the Court should that be deemed necessary. Dr. Lanning's testimony falls well within the standards of admissible expert opinions.

Finally, defendant's proposed classification under heading 3907, HTSUS, is unsupported in law and in fact.

**I. PTMEG 2000 is an Artificial Wax of Heading 3404 under the Governing Rules <u>of Tariff Classification.</u>**

**A. <u>Note 5 to Chapter 34 Directs Classification under Heading 3404.</u>**

The parties are fully in accord that if the subject merchandise is classifiable under heading 3404, HTSUS, it is excluded from Chapter 39 by operation of Note 2(b) to Chapter 39, HTSUS.

Beginning on page seven of its brief ("Def. SJ Mot."), defendant correctly states that merchandise imported into the United States is classified under the HTSUS and that classification is governed by the General Rules of Interpretation (GRIs) and the Additional U.S. Rules of Interpretation. Def. SJ Mot. at 7. Acknowledging (as does plaintiff) that GRI 1 is operative here, defendant righty notes that GRI 1 provides that "for legal purposes, classification

shall be determined according to the terms of the headings and any relative Section or Chapter notes…." *Id*.

Appropriately, defendant emphasizes the compulsory, statutory nature of the section and chapter notes. Defendant's recitation on this point is set out so clearly, it merits citation in full:

> GRI 1 establishes that "the terms of the headings and any relative section or Chapter Notes [sic] are paramount, *i.e.*, they are the first consideration in determining classification." GRI 1; *see also The Pomeroy Collection, Ltd. v. United States*, 559 F. Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008). The HTSUS section and chapter notes "are not optional interpretive rules," but instead have the force of statutory law. *Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (internal quotation marks omitted).
>
> *Id*. at 7-8.

It is in the application, or rather lack of application, of these governing rules that defendant's argument goes astray. Section III of defendant's brief lays out its opposition to classification under heading 3404, HTSUS. After reiterating that Note 2(b) to Chapter 39, HTSUS, excludes waxes of heading 3404, defendant goes straight into a discussion of dictionary definitions of waxes, followed by a lengthy exposition on the *Harmonized Commodity Description and Coding System, Explanatory Notes* ("Explanatory Notes"). *Id*. at 9-14.

What is missing is any argument, discussion or even suggestion as to why Note 5 to Chapter 34, HTSUS, which details the scope of the term "artificial waxes" of heading 3404, HTSUS, does not direct that the Court find that PTMEG 2000 is an artificial wax of heading 3404, HTSUS. Defendant correctly states that the chapter notes are "paramount;" "the first consideration in determining classification;" "not optional;" and "have the force of statutory law." *Id*. at 7-8. Yet, glaringly, defendant fails to address the governing chapter note.

Note 5 to Chapter 34, HTSUS, is dispositive of the core issue before the Court. As plaintiff demonstrated in its brief-in-chief, PTMEG 2000 is an artificial wax of heading 3404,

HTSUS, because it is indisputable that PTMEG 2000 is a chemically produced organic product of a waxy character. Defendant has repeatedly conceded that PTMEG has a waxy character, and does so again in its brief (*see* Def. SJ Mot. at 7). It is also beyond contention that none of the exclusions set out in Note 5 are applicable.

Any relevant chapter or section notes must be applied before non-statutory sources, such as dictionaries or Explanatory Notes are considered. Defendant has not applied the governing law and its argument necessarily fails.

### B. Classification under Heading 3404 is not Dependent on Dictionary <u>Definitions.</u>

Again, the core issue is whether PTMEG 2000 is an artificial wax of heading 3404, HTSUS. Defendant posits that "[w]here, as here, relevant terms are undefined in the tariff statue, they "are {to be} construed according to their commercial {and} common meanings," and that the Court may rely upon lexicographic authorities. *Id*. at 8 (citations omitted). Taken in the abstract, this would be correct. However, here, the statute defines "artificial waxes" and does so at length in Note 5 to Chapter 34, HTSUS. Therefore, the term "artificial waxes" cannot be said to be "undefined."

Plaintiff did not introduce dictionary citations for the purpose of supplying a definitive definition of the tariff term "artificial waxes" – the statute does this. Rather, plaintiff merely demonstrated that dictionary definitions of "wax" are broad and certainly encompass PTMEG 2000. Defendant concedes that under dictionary definitions, PTMEG 2000 could be considered an artificial wax. *Id*. at 12. While this concession is supportive of plaintiff's position, it is of minimal significance, given the detailed enumeration supplied by the statute itself in Note 5 and the fact that PTMEG 2000 falls squarely within the statutorily defined term.

### C. The Explanatory Notes Cannot Supersede Chapter Note 5.

Defendant would have the Court supplant the Chapter Note 5 definition of "artificial waxes" with specifications that appear only in the Explanatory Notes. In so doing, defendant does not address *Archer Daniels Midland Co. v. United States*, 561 F.3d 1308 (Fed. Cir. 2009), which addressed a very similar issue and held that the Explanatory Notes cannot be given the effect of limiting the scope of an unambiguous tariff provision. In support of its position, defendant posits that the tariff term "artificial waxes" is ambiguous because dictionary and industry definitions of "waxes" are "too broad and general." Def. SJ Mot. at 13. This misses the point – the term "artificial waxes" is unambiguous because Chapter Note 5 supplies a detailed and precise enumeration of what is an artificial wax for purposes of heading 3404, HTSUS. PTMEG 2000 falls squarely within the Chapter Note 5 requirements.[1] Accordingly, the Explanatory Notes cannot be applied to supersede the tariff itself.[2]

Defendant relies on *Lemans Corp. v. United States*, 660 F.3d 1311 (Fed. Cir. 2011), to support its claim that the Explanatory Notes to heading 3404 are instructive because they are not "broader than, {or} directly contradictory to a common meaning of a subheading term." Def. SJ Mot. at 14. *Lemans* is simply not analogous. The Federal Circuit in *Lemans* affirmed the Court of International Trade's decision to rely on the Explanatory Notes to inform its interpretation of

---

[1] Being that PTMEG 2000 is an artificial wax pursuant to Note 5, it is plaintiff's position that the Explanatory Notes cannot be applied to limit the scope of the terms set out in Note 5. That said, plaintiff is prepared to demonstrate that PTMEG 2000 meets the terms of the Explanatory Notes as well and that the sample tested by the CBP Laboratory could not have returned to a fully solid, testable state after sitting at room temperature for only two hours after having been heated until it was in liquid form.

[2] We note that defendant's position is based solely upon the Explanatory Notes' reference to dropping point; it has not contended that PTMEG 2000 does not meet any of the other interpretations set out in the Explanatory Notes.

the term "sports equipment," which was not defined in HTSUS. *Lemans*, F.3d at 1318-22. Here, as discussed *supra*, the HTSUS defines "artificial waxes" and does so at length in Note 5 to Chapter 34, HTSUS. As such, the Federal Circuit's decision in *Archer Daniels* should control here.

A further reason for not superimposing the specifications of the Explanatory Notes is that it is axiomatic that merchandise subject to classification must be evaluated for tariff purposes in its condition as imported. *Rollerblade, Inc. v. United States*, 112 F.3d 481, 487 (Fed. Cir. 1997) (citing *Simod Am. Corp. v. United States*, 872 F.2d 1572, 1577 (Fed. Cir. 1989)). It is undisputed that in its imported condition, PTMEG 2000 is a white, waxy solid. Defendant's Responses to Plaintiff's Statement of Material Facts Not in Dispute at ¶ 12. Being that PTMEG 2000 is in a solid state in its condition upon importation, the only relevant legal issue is whether that white, waxy solid is an "artificial wax." Because of the requirement for classifying based on condition as imported, any testing must be done on a fully solid sample. Defendant's expert witness has conceded that it would be inappropriate to test a sample in its liquid form. Ahlemeyer Decl. at ¶ 9 ("It's unlikely that an experienced operator in the CBPL would attempt to measure the dropping point of a wax that is still in liquid form as implied in Dr. Lanning's report."). The Court should decline the invitation to consider the properties of the subject merchandise in a condition other than the legally relevant one, namely, its condition upon importation.

### D. Defendant Admitted that PTMEG 2000 is Artificial Wax for Tariff Purposes.

In its brief, defendant recharacterizes its admission of the core issue in this case, namely, that PTMEG 2000 is an artificial wax: "the Government acknowledges that, colloquially, and by dictionary definition alone, PTMEG 2000 could be described as an artificial wax." Def. SJ Mot. at 12. However, that was not the testimony of defendant's Rule 30(b)(6) witness.

Defendant's Rule 30(b)(6) witness is an attorney with CBP's Office of Trade, Regulations and Rulings Directorate. Pl.'s Stmt. of Material Facts not in Dispute ("PSMF") at ¶ 8. In accordance with USCIT R. 30(b)(6), the witness testified as to defendant's legal positions in this case. He was not asked to opine on how PTMEG 2000 is described colloquially, and appropriately, he did not conjecture how it might be described colloquially. The witness also was not asked and did not speculate whether PTMEG 2000 fits within dictionary definitions. Rather, in the context of detailed questioning regarding defendant's legal position as to the tariff classification of the subject merchandise, the witness stated that "CBP agrees that PTMEG 2000 at issue here is an artificial wax." Horne Tr. at 17:6-18:6. Defendant's argument that its admission necessitates application of the Explanatory Notes is a non sequitur. Rather, its admission establishes that there is no material issue of fact in dispute. Being that PTMEG 2000 is an "artificial wax" for tariff purposes, it must be classified in heading 3404, HTSUS, which is the *eo nomine* provision covering "artificial waxes."

As an *eo nomine* provision, heading 3404, HTSUS, covers all forms of artificial waxes. *See CamelBak Prods., LLC v. U.S.*, 649 F.3d 1361, 1364-65 (Fed. Cir. 2011); *National Advanced Systems v. United States*, 26 F.3d 1107, 1111 (Fed. Cir. 1994).

At least one court has suggested that even when applying an e*o nomine* provision, it may be instructive to consider the traditional use factors.[3] *GRK Canada, Ltd. v. United States*, 761 F.3d 1354 (Fed. Cir. 2014), *reh'g den. by, reh'g, en banc, den. by* 773 F.3d 1282 (Fed. Cir. 2014). In that context, it bears noting that defendant has admitted that PTMEG 2000 is commercially marketed as a wax. Defendant's Responses to Plaintiff's Statement of Material Facts Not in Dispute at ¶ 10.

## II. <u>The Court Should Exclude Portions of Dr. Ahlemeyer's Declaration.</u>

On November 14, 2024, the Court issued an Amended Scheduling Order which provided, *inter alia*, that "[t]he identity of expert witnesses, if any, shall be disclosed and the related disclosures pursuant to Rule 26 shall be served by December 6, 2024." ECF No. 27. Defendant identified Dr. Ahlemeyer, an Analytical Chemist at Eurofins EAG Materials Science, LLC, and provided his expert report to plaintiff on December 6, 2024.

In support of its cross-motion for summary judgment, defendant attached a declaration prepared by Dr. Ahlemeyer. That declaration includes new opinions and statements that do not appear in the expert report that was furnished on December 6, 2024, and defendant's brief relies extensively on these new opinions and statements.

USCIT R. 26(a)(2) governs the disclosure of expert testimony, which must be accompanied by a written report prepared and signed by the expert. USCIT R. 26(a)(2)(B). The written report must contain "a *complete* statement of *all* opinions the witness will express and the basis and reasons for them." (emphasis added). *Id.* This disclosure must follow the sequence

---

[3] The use factors include how the merchandise is designed, manufactured, marketed, sold and used. *See generally United States v. Quon Quon*, 46 CCPA 70, 73 (1959); *United States v. Carborundum*, 63 CCPA 98, 102 (1976).

and time as directed by the Court. USCIT R. 26(a)(2)(C). The Court rules further provide a mechanism for supplementing expert witness reports. USCIT R. 26(e)(2).

The purpose of these rules is obvious – they act to provide notice to opposing counsel prior to deposition that fully identifies the expert witness's opinion testimony. *See* USCIT R. 26(b)(4)(A); *see also Amendments to Fed. R. Civ. P. 4*, 146 F.R.D. 401, 633-34 (1993). Absent the mandatory disclosures, opposing counsel would be deprived of the ability to question an expert witness in deposition as to the expert's opinions.

The proffering of entirely new opinions in the declaration of Dr. Ahlemeyer is violative of USCIT R. 26. This is particularly so given that defendant did not supplement the original expert report within the time frame set out by the Court (or ever).

While it appears that this Court has not directly addressed this issue, several other courts have.[4] For example, in *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655 (6th Cir. 2005), the Sixth Circuit affirmed the district court's decision to exclude an expert's affidavit on the basis that the opinions in the affidavit were not in the expert's report and were not provided as a supplemental report as required by Rule 26.[5] Similarly, in *Franconero v. UMG Recordings,*

---

[4] This Court has disallowed expert testimony in other contexts due to untimely disclosures. *See American Sporting Goods v. United States*, 24 CIT 1156 (2000) (granting a motion in limine excluding the expert testimony of witnesses that were not identified until three months after the close of discovery).

[5] The facts, as outlined by the trial court, are analogous to this case. In *Brainard*, the opinions contained in the expert's affidavit were "not contained anywhere in his Expert Report." *Brainard v. American Skandia Life Assur. Corp.*, 2004 WL 5550483, at *7 (N.D. Ohio 2005). Further, the deadline for expert discovery was July 16, 2004, and "[t]here [was] no indication that plaintiffs properly supplemented Mr. Duval's Expert Report and, to the contrary, it appears that Mr. Duval's opinion regarding actual authority and the OCIC documents was not disclosed until plaintiffs filed their Brief in Opposition to defendant's Motion for Summary Judgment on September 7, 2004." *Id.* The district court found that it would not consider the supplemental expert opinion. *Id.* This finding was ultimately affirmed by the Sixth Circuit, who found that "[t]he district court did not err by disregarding Duval's opinion . . . ." *Brainard*, 432 F.3d at 664.

*Inc.*, 542 Fed. Appx. 14 (2d. Cir. 2013 (Summary Order)), the court upheld excluding an opinion first supplied in an affidavit in support of a brief in opposition to a motion for summary judgment where that opinion was not included in the expert report and the plaintiff failed to justify that omission.

The Ahlemeyer Declaration introduces new expert opinions well outside the time requirements provided by the Court and presents them for the first time in response to plaintiff's motion for summary judgment. Several of these new opinions could have been addressed at the time that his initial report was provided to plaintiff. For example, Dr. Ahlemeyer now opines (without corroboration from ASTM) as to alleged reasons for the withdrawal of ASTM D566. As Dr. Ahlemeyer writes himself, ASTM D566 "was withdrawn on March 8, 2023." Ahlemeyer Decl. at ¶ 6. In other words, the withdrawal occurred nearly two years before his expert report of December 6, 2024. Accordingly, plaintiff was denied the opportunity to depose Dr. Ahlemeyer regarding these new opinions because they were never timely disclosed.

The Court's rules are clear regarding a party's failure to disclose or supplement information as required by USCIT R. 26(a) or (e). USCIT R. 37(c)(1) states "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

The below table identifies the new opinions offered by Dr. Ahlemeyer in his declaration, that are not included in his expert report:

---

Lastly, though not directly addressed in *Brainard*, the Ninth Circuit has stated that failing to timely supplement expert report pursuant to Rule 26, subjects the supplemental information to the exclusionary sanctions of Rule 37(c)(1), absent a showing that the failure was "substantially justified or is harmless." *See Key v. Qualcomm Inc.*, 129 F.4th 1129, 1143 (9th Cir. 2025).

| **Dr. Ahlemeyer's New, Undisclosed Opinions** | | |
|---|---|---|
| **Language From Declaration** | **Declaration Paragraph** | **Citations in Motion for SMJ** |
| "ASTM D3954-15 is [] widely accepted . . . ." | ¶ 5 | Pgs. 14, 15, 18 |
| "ASTM D3954 is offered by many testing laboratories that specialize in testing greases and waxes. For example, SPL Laboratories lists ASTM D566, D2265, and D3954 in the dropping point methods they offer on their website. Dallas Laboratories, Inc., another laboratory in Texas, lists ASTM D566 and D3954 in the dropping point methods they offer as well." | ¶ 5 | Pgs. 14, 15, 18 |
| "Although ASTM D566-20 was current at the time of the testing in Dr. Lanning's report, it was withdrawn on March 8, 2023 and replaced by ASTM D2265. ASTM D2265 uses a heating block rather than oil bath and has a narrower reproducibility between laboratories of 9°C compared to 13°C for ASTM D566. ASTM International did not publish the reason for withdrawal of ASTM D566. It can be inferred that the reasons for withdrawal were due to the safer heating with a heating block and due to the better reproducibility of ASTM D2265. Even prior to withdrawal, a technical note from Canoil Canada Ltd. on dropping point measurement stated that ASTM D2265 should be used for their samples based on these two reasons. ASTM D3954 and ASTM D2265 would both be considered better test methods for dropping point measurement since both have a safer approach to heating and superior reproducibility." | ¶ 6 | Pgs. 15, 16, 18-20 |
| "The narrower confidence interval is due to the superior precision of a dropping point measured by an automated testing method where the instrument determines when the dropping point is reached under careful temperature control." | ¶ 7 | Pgs. 16, 18, 20, 21 |
| "If the automated testing method of ASTM D3954 was applied to samples prepared by modified procedures, then the conclusion that sample preparation, not test method caused discrepancies between the SPL and CBPL tests would be valid." | ¶ 8 | Pgs. 16, 19, 21 |

Pursuant to USCIT R. 37(c)(1), the Court should exclude the new opinions and statements of Dr. Ahlemeyer's declaration as they offer inadmissible, undisclosed opinions that do not appear in defendant's expert report.

## III. Dr. Lanning's Testimony is Admissible.

Defendant urges that the opinions of plaintiff's expert witness Dr. Wade Lanning should be disregarded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993), arguing that (1) ASTM D3954 is a widely accepted method and is superior to ASTM D566; and (2) that Dr. Lanning's testimony is not helpful to the Court.

Pursuant to Federal Rule of Evidence 702 (FRE),[6] expert witness testimony is admissible subject to the following criteria:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Defendant offers no challenge to Dr. Lanning's scientific, technical or specialized knowledge;[7] nor does defendant argue that his testimony is based on insufficient facts or data. Rather, defendant's challenge rests on the alleged "superiority" of the CBPL's test method and on a conclusory assertion that Dr. Lanning's findings would not be helpful to the Court. Were the Court to determine that dropping point is a material issue, Dr. Lanning's testimony would be highly probative.

---

[6] FRE 702 was amended in 2000 to reflect the standard set by the Supreme Court in *Daubert* and in subsequent cases applying the standard, such as *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

[7] Plaintiff has previously established that Dr. Lanning is eminently qualified to opine on testing waxes, particularly regarding thermodynamics and kinetics of phase transformations, such as when a wax transforms from a solid to a liquid. Plaintiff's Motion for Summary Judgment at 15.

**A. ASTM D566 is a Reliable Test Methodology**

Premised upon the impermissible new opinions of its expert witness, defendant contends that "ASTM D3954 is a widely accepted test method for determining the dropping point of waxes . . . ." and that the testing conducted by the CBPL using ASTM D3954 is valid because the methodology used "leads to high precision measurements."[8] Def. SJ Mot. at 15, 18. Further, defendant contends that Dr. Lanning's test results using ASTM D566 should be disregarded because (1) "it is no longer an active test method"; (2) "ASTM D566 is primarily designed to test the dropping point of lubricating grease not artificial waxes"; and (3) "ASTM D3954 possesses 'superior reproducibility' compared to ASTM D566." *Id*. at 19-20. As discussed, these new opinions were introduced in violation of USCIT R. 26 and 37.

Notwithstanding this objection, none of these assertions undermine Dr. Lanning's findings under the *Daubert* standard for reliability. As articulated by the Court of Appeals for the Federal Circuit in *Libas, Ltd. v. United States*, 193 F.3d 1361 (Fed. Cir. 1999), "[t]he Supreme Court, in *Daubert,* cited four such factors: (1) the testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted."[9] (internal citations omitted). *Id*. at 1366-67. The Federal Circuit also stated that "[i]f a test, methodology or procedure is clearly shown to be generally accepted and to test what is at issue in the case, a court is entitled

[8] Defendant in support of its claim cites the Ahlemeyer Declaration at ¶ 5, which states that SPL Laboratories and Dallas Laboratories offer ASTM D3954. While these companies may purport to offer ASTM D3954, upon information and belief, neither has the requisite equipment available to perform the test.

[9] The Court of Appeals in *Libas* also stated that the *Daubert* factors are relevant in a Customs classification case.

to have confidence in its results unless some particular reason for doubt arises, such as failure under the other Daubert factors." *Id*. at 1368.

Here, Dr. Lanning's findings under ASTM D566 and his determinations challenging the reliability of the test preparation procedures of the CBPL satisfy *Daubert*. It is clear that ASTM D566 is generally accepted by the scientific community, as evidenced by its longstanding tenure as a methodology for dropping point testing and by virtue of its publication by ASTM was periodically subjected to peer review.[10] Further, the hypothesis underlying ASTM D566, as a methodology for determining the dropping point of a wax, is obviously testable and has a 95% confidence interval. Ahlemeyer Decl. at ¶ 7. Accordingly, Dr. Lanning's findings are not undermined by the *Daubert* factors.

Regarding the alleged superiority of CBP's choice of testing methodology (and presumably, its test results), Dr. Ahlemeyer states that ASTM D3954 has a "95% confidence interval for repeatability between the same operator as 0.5°C and reproducibility between laboratories as 1.5°C." *Id*. However, defendant's own test results do not satisfy its claimed repeatability and reproducibility standards. Specifically, the testing on the subject merchandise conducted by CBPL resulted in dropping points of 31.7°C, 33.1°C, 38.3°C, and 38.1°C, a range of 6.6°C, well outside the claimed reproducibility range of 1.5°C.[11] Def. SJ Mot. at 16.

In an attempt to discredit Dr. Lanning's use of ASTM D566, defendant relies on a brand-new opinion of Dr. Ahlemeyer, who conjectures, with no citation to any ASTM publication, that

[10] ASTM D566 was originally approved in 1940 and adopted as a joint ASTM-IP standard in 1964. *See* ASTM D566-97, *Standard Test Method for Dropping Point of Lubricating Grease* (1997), https://www.normadoc.com/media/file/20/d4/2319e965b9100db7bc14a5a0321a.pdf.

[11] Dr. Ahlemeyer speculates with no support that this may be due to testing different batches of PTMEG 2000.

a "potential reason[]" for withdrawal was due to the "superior reproducibility" of ASTM D2265, a test method that was neither used by Dr. Lanning nor by the CBPL. Ahlemeyer Decl. at ¶ 6.

Regarding defendant's claim that ASTM D566 is not a proper method for testing waxes, this argument is refuted by the language of ASTM D3954, which states that "[t]he procedure for measuring the dropping point of waxes with the Mettler instrument has been developed to duplicate the results obtained by Test Method D566." Def. SJ Mot. at Exh. 8.

**B. <u>Dr. Lanning's Testimony Would be Helpful to the Court.</u>**

Defendant claims that the testing conducted by Dr. Lanning would not be helpful to the Court because his results "did not produce an 'apples to apples' comparison . . . ." Def. SJ Mot. at 21. In addition to relying on its expert witness, defendant cites to *G.G. Marck & Associates, Inc. v. United States*, 2015 WL 3757040 at *9 (Ct. Int'l Trade June 17, 2015), for the proposition that expert witness testimony must be helpful. The Court in *G.G. Marck & Associates, Inc.* stated that expert witness testimony is "not needed or useful where the question at issue is one that a person of usual discernment could decide and where the subject of expert testimony 'can and does speak for itself.'" (internal citations omitted). *Id*. The Court ultimately found that testimonies of the experts at issue in that case were inadmissible because their testimonies "could apply to countless items that surely do not coordinate with the merchandise at issue" and "a person of usual discernment does not need the assistance of an expert to make a decision of whether dinnerware items are in the same pattern." *Id*. at *10. The circumstances and outcome in *G.G. Marck & Associates, Inc.* are simply not analogous to the facts at issue in this case because the subject of Dr. Lanning's testimony cannot and does not speak for itself. *Id*. at *9.

Here, plaintiff would be offering Dr. Lanning's expert testimony at trial to assist the Court in assessing the reliability of CBPL's testing of a chemical compound, hardly analogous to

readily apparent patterns appearing on dinnerware. Dr. Lanning's opinions would be helpful to the Court because he is irrefutably an expert in his field and he can speak to the sample preparation that he personally directed applying the methodology articulated in ASTM D3954 and which was unable to produce a testable sample.[12] Accordingly, Dr. Lanning's expert testimony would provide the Court with relevant data and information regarding PTMEG 2000, which would certainly be helpful to the Court.

Tellingly, defendant does not address the supercooling properties of PTMEG 2000. Dr. Lanning repeatedly tested PTMEG 2000 to confirm that due to the product's inherent supercooling properties – after heating the sample until it becomes a liquid, it remains in a non-fully solid state after sitting at room temperature for only two hours. PSMF ¶¶ 36, 40, 42. It is unsurprising that defendant would seek to gate-keep Dr. Lanning's testimony, given that it undermines the validity of the CBPL findings. Were the issue of dropping point to become a significant issue in this case, Dr. Lanning's testimony would indeed be of great help to the Court.

Dr. Lanning's testimony is admissible under the *Daubert* standard and FRE 702 and would assuredly be a help to the Court. Defendant's arguments to the contrary are unsupported, or are supported solely by inadmissible, new expert opinions.

## IV. PTMEG 2000 is not Classifiable under Heading 3907, HTSUS.

Defendant has admitted that PTMEG 2000 is an artificial wax. Horne Tr. at 17:6-18:6. Because the subject merchandise is an artificial wax, defendant's claimed classification under

[12] Defendant attempts to discredit Dr. Lanning's findings by confusingly pointing to how Dr. Lanning did not complete his testing under ASTM D3954. However, this overlooks a central issue of the testing. Dr. Lanning followed the test sample preparation guidelines of ASTM D3954, as written. Upon doing so, Dr. Lanning was unable to produce a testable sample.

heading 3907, HTSUS, must fall by operation of Note 2(b) to Chapter 39, HTSUS, which provides that Chapter 39 does not cover "[w]axes of heading 2712 or 3404."

To buttress its claim, defendant cites the Explanatory Notes to heading 3907 at length for the unsupportable proposition that all "other polymers" that are characterized by the presence of "ether-functions" are classifiable in subheading 3907.20, HTSUS. Def. SJ Mot. at 23. This suggestion is belied by the very section of the Explanatory Notes that defendant quotes.

The cited Explanatory Notes state that "[t]he most important members of this group are poly(oxyethylene) (polyethylene glycol), . . . ." *Id*. Polyethylene glycol is an "other polymer" characterized by the presence of ether functions. *Id*. However, polyethylene glycol ("PEG"), when entered in waxy form, is specifically provided for in subheading 3404.20.00, HTSUS, which covers "[a]rtificial waxes and prepared waxes: Of poly(oxyethylene) (polyethylene glycol)."[13] As such, defendant's reading of the Explanatory Notes to mean that all polymers featuring ethers are classifiable in subheading 3907.20, HTSUS, cannot stand.

Necessarily, defendant's interpretation would render subheading 3404.20.00, HTSUS, meaningless as to polyethylene glycol. As is the case with any statute, "[w]hen interpreting HTSUS provisions, [courts] must strive to give effect to every word in the statutory text." *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (internal citations

---

[13] *See* Explanatory Notes to heading 3404 which state as follows:

> The waxes of this heading vary in chemical composition. Such waxes include : . . . (4) Poly(oxyethylene) (polyethylene glycol) waxes. They are water-soluble and are used in cosmetics or pharmaceuticals, as binding agents, softeners, preservatives and in adhesives for textiles or paper, in inks or rubber compositions, etc.

*See also* NY N297602 (June 28, 2018) (classifying activated polyethylene glycol in waxy form in subheading 3404.20.00, HTSUS).

omitted). As such, "[a]n interpretation of a tariff provision will be disfavored if it 'render[s] other language in [the relevant subheading] superfluous.'" *Sony Electronics, Inc. v. United States*, 37 C.I.T. 1748, 1751 (2013) (quoting *Deckers Outdoor Corp.*, F.3d at 1371). Here, defendant's interpretation of subheading 3907.20, HTSUS, would render subheading 3404.20, HTSUS, superfluous. Plainly, it is not the case that all other polymers with ether-functions are classified in in subheading 3907.20, HTSUS.

Just as PEG is classified in heading 3404, HTSUS, when imported in waxy form, so too PTMEG 2000 is properly classified in heading 3404, HTSUS. It is uncontested that in its condition upon importation, PTMEG 2000 is a white, waxy solid. Defendant's Responses to Plaintiff's Statement of Material Facts Not in Dispute at ¶ 12. As the Supreme Court stated in 1891, "the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported." *Worthington v. Robbins*, 139 U.S. 337, 341 (1891). PTMEG 2000 is a wax in the condition in which it is imported; it is indisputably "artificial." As such, it must be classified in heading 3404, HTSUS.

In an effort to meet the terms of heading 3907, HTSUS, as defined by Note 6 to Chapter 39, HTSUS, which require that other polyethers be in "primary forms," defendant states the sample "can be described in its primary form as a 'shape," 'lump,' or 'similar bulk form.'" Def. SJ Mot. at 22. In support of this claim, Defendant cites to the product sample submitted to the Court and to *Jing Mei Auto. (USA) v. United States*, 682 F. Supp. 3d 1354, 1363 (Ct. Int'l Trade 2023), for the proposition that a sample is a "potent witness." However, *Jing Mei Auto* held that samples are potent witnesses with respect to "the purpose for which an article is designed." *Id.* at 1363 (quoting *Janex Corp. v. United States*, 80 Cust. Ct. 146, 148 (1978)). Here, defendant does not cite the Court's "potent witness" precedent with respect to the purpose for which

PTMEG 2000 is designed. Rather, defendant errantly relies on *Jing Mei Auto* to support its own observations of the physical properties of the submitted sample. Accordingly, defendant has not properly established that the subject merchandise meets the "primary forms" requirements set out in Note 6 to Chapter 39, HTSUS.

## CONCLUSION

There are no disputed material facts in this case. Defendant has not overcome the clear statutory language that directs classification under subheading 3404.90.51, HTSUS. Therefore, plaintiff respectfully requests that the Court deny defendant's cross-motion for summary judgment; grant plaintiff's motion for summary judgment; and order CBP to reliquidate the subject entries with classification of the subject merchandise under subheading 3404.90.51, HTSUS, and to refund the excess duties paid with interest as provided by law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, FL 36
New York, New York 10022
Tel. (212) 557-4000
JSpraragen@gdlsk.com

By: /s/ Joseph M. Spraragen
Joseph M. Spraragen
Matthew A. Seymour

Dated: September 14, 2026
New York, New York

**CERTIFICATE OF COMPLIANCE**

Pursuant to USCIT Standard Chambers Procedures Rule 2(B), I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 5,803 words including text, headings, footnotes, and quotations. This word count is within the limit of 14,000 words set forth in Rule 2(B).

/s/ Joseph M. Spraragen
Joseph M. Spraragen
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
599 Lexington Ave., FL 36
New York, New York 10022

Dated: September 14, 2026
New York, New York