UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP, JUDGE

GANTRADE CORP.,

*Plaintiff*,

v.

UNITED STATES

*Defendant*.

Court No. 21-00551

**DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL

Emma Tiner
Attorney
U.S. Customs and Border Protection
Office of Chief Counsel
International Trade Litigation

November 20, 2026

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

MONICA P. TRIANA
Assistant Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

ADAM A. VISCHIO
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, NY 10278
(202) 305-5528

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .......... 1

I. The Imported Merchandise Is Not Classifiable As "Artificial Wax" Of Heading 3404, HTSUS, Because It Does Not Have Dropping Point Above 40°C. .......... 3

II. Plaintiff's Testing Of The Subject Merchandise Should Be Excluded Because Plaintiff's Expert Used A Now Defunct Testing Method .......... 8

III. The Court Can Consider The Declaration Of Dr. Ahlemeyer .......... 10

IV. PTMEG 2000 Is Properly Classified Under HTSUS Subheading 3907.20.00 Because It Is An Other Polyether In Primary Form .......... 12

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Cases**

*Adolph Hurst & Co. v. United States*, 33 CCPA 96 (C.C.P.A. 1946) .......... 5

*Archer Daniels Midland Co. v. United States*, 561 F.3d 1308 (Fed. Cir. 2009) .......... 7, 8

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999) .......... 3

*Cozy Comfort Company, LLC v. United States*, Court No. 22-00173 2024 WL 4491607 (Ct. Int'l Trade. Oct. 15, 2024) .......... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 9

*Degussa Corp. v. United States*, 508 F.3d 1044 (Fed. Cir. 2007) .......... 7

*Fuji Am. Corp. v. United States*, 519 F.3d 1355 (Fed. Cir. 2008) .......... 4

*G.G. Marck & Associates, Inc. v. United States*, 2015 WL 3757040 (Ct. Int'l Trade June 17, 2015) .......... 9

*Kahrs Int'l, Inc. v. United States*, 713 F.3d 640 (Fed. Cir. 2013) .......... 5

*Lanxess Corp. v. United States*, 838 F. Supp. 3d 1377 (Ct. Int'l Trade 2026) .......... 4

*Lemans Corp v. United States*, 660 F.3d 1311 (Fed. Cir. 2011) .......... 7

*Libas, Ltd. v. United States,* 193 F.3d 1361(Fed. Cir. 1998) .......... 9

*Motorola, Inc. v. United States*, 436 F.3d 1357 (Fed. Cir. 2006) .......... 7

*New Image Global Inc., v. United States*, 399 F. Supp. 3d 1257 (Ct. Int'l Trade. 2019) .......... 9

*Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F.Supp.2d 463 (N.D.N.Y. 2003) ............... 12

*Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998) ...................................... 14

*R.T. Foods, Inc. v. United States*, 757 F.3d 1349 (Fed. Cir. 2014)............................................. 14

*Rubies Costume Co. v United States*, 279 F. Supp. 3d 1145 (Ct. Int'l Trade 2017)....................... 9

*Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158 (Fed. Cir. 2017) ............................... 4

*StoreWALL, LLC v. United States*, 644 F.3d 1358 (Fed. Cir. 2011).......................................... 7, 8

*Warner-Lambert Co. v. U.S.*, 341 F. Supp. 2d 1272 (Ct. Int'l Trade 2004) ................................ 12

**Statutes**

28 U.S.C. § 2640(a) ......................................................................................................... 4

**Rules**

USCIT Rule 26(a) ........................................................................................................... 10

USCIT Rule 37 ............................................................................................................. 2, 12

USCIT Rule 56 ................................................................................................................. 1

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP, JUDGE

| | |
|---|---|
| GANTRADE CORP.,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES<br><br>*Defendant*. | Court No. 21-00551 |

**DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (Government), respectfully submits this reply memorandum of law in further support of its cross-motion for summary judgment and in opposition to the motion for summary judgment filed by Plaintiff, Gantrade Corp. (Gantrade or Plaintiff), pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT).

## INTRODUCTION

Plaintiff urges this Court to disregard the language in the relevant Explanatory Note (EN), specifically EN 34.04, because, it contends, the chapter notes for Chapter 34 of the Harmonized Tariff Schedule of the United States (HTSUS) are dispositive. While the text of the heading and chapter notes is the first consideration in determining the meaning of the terms of the HTSUS under Rule 1 of the General Rules of Interpretation (GRI), neither the language of the heading here, nor the relevant chapter notes define the relevant statutory term, "artificial waxes." Therefore, consideration of both the term's common and commercial meaning and the applicable EN, is appropriate.

Next, Plaintiff alleges that Government improperly relies on "new" opinions of its expert, Dr. Nicholas Ahlemeyer. Not so. Dr. Ahlemeyer's affidavit largely reiterates the opinions disclosed in his December 6, 2024 expert report. And, to the extent any of the statements in Dr. Ahlemeyer's affidavit are "new" opinions, their inclusion is substantially justified and harmless under USCIT Rule 37 because they rely on publicly available information known to Plaintiff for at least three years.

Finally, Plaintiff contends that since certain waxes of polyethylene glycol ("PEG") are classifiable under subheading 3404.20.00, HTSUS, it follows that the subject merchandise, Polytetramethylene Ether Glycol 2000 ("PTMEG 2000"), should be classified under the same provision. This argument fails. As a threshold matter, under GRI 1, Courts construe the language of the heading first, without reference to the subheading, so Plaintiff cannot interpret the language of heading 3404 with the aid of terms that only appear in a subheading. Moreover, because "PEG" covers a wide range of products that are not necessarily comparable to PTMEG 2000, the Court should not make a determination as to the proper tariff classification of products not at issue in this case. Here, it is undisputed that PTMEG 2000 is a polyether with repeating tetrahydrofuran ether units in its "backbone." Therefore, PTMEG 2000 is properly classifiable as an "other polyether{}… in primary form{}" under subheading 3907.20.00, HTSUS (2019).[1]

[1] This subheading no longer exists in the HTSUS but was in effect at the time of entry for the subject entries. It has since been replaced by subheadings 3907.21.00 and 3907.29.00, HTSUS. For purposes of determining the appropriate tariff classification, the Court reviews the version of the tariff version in effect at the time of entry. *See, e.g.*, *Nutricia North America, Inc. v. United States*, 159 F.4th 1344, 1349 (Fed. Cir. 2025) (affirming the Court's reference to HTSUS provisions in effect at time of entry).

## ARGUMENT

### I. The Imported Merchandise Is Not Classifiable As "Artificial Wax" Of Heading 3404, HTSUS, Because It Does Not Have Dropping Point Above 40 °C.

PTMEG 2000 is used as a component (the "soft segment") in the manufacture of various products, including spandex. *See* Rule 73.1 Submission, Dkt. No. 6. In its condition as imported, PTMEG 2000 appears as a white, wax-like, pliable substance. *See* Notice of Manual Filing, Dkt. No. 8. That characterization alone, however, does not end the inquiry as to its proper classification. Plaintiff's claimed classification, heading 3404, HTSUS, covers "artificial waxes and prepared waxes." Heading 3404 does not cover every manmade substance that appears waxy in nature. Plaintiff must demonstrate that the subject merchandise satisfies the common and commercial meaning of the term "wax," which is not defined in the tariff itself.

As set forth in our opening brief, the Government properly interpreted heading 3404, and the term "artificial waxes," in accordance with the plain language of the HTSUS, the common meaning of the relevant terms, and considering the language of EN 34.04. *See* Def. Opposition to Pl. Mot. for Summary Judgment and Cross-Motion for Summary Judgment (Def. MSJ) at 21-24; *see also, e.g.*, *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." (citations omitted)).

Plaintiff argues that the Government "fails to address the governing chapter note" and specifically, that Note 5 to Chapter 34 is "dispositive of the core issue before the court." Pl. Mem. of Law in Response to Def. Cross-Mot. for Summary Judgment and Reply to Def. Opp'n to Pl's Mot. for Summary Judgment ("Pl. Reply Brief") at 3. Plaintiff's understanding of the chapter note and the Government's analysis is incorrect.

Note 5 to Chapter 34 does not define the term "artificial waxes." Rather, as illustrated below, it identifies the categories of artificial waxes included within the statutory term:

> In heading 3404, subject to the exclusions provided below, the expression "artificial waxes and prepared waxes" applies only to:
>
> (a) Chemically produced organic products of a waxy character, whether or not water-soluble;
> (b) Products obtained by mixing different waxes;
> (c) Products of a waxy character with a basis of one or more waxes and containing fats, resins, mineral substances or other materials.

Plaintiff claims that the merchandise is "chemically produced organic products of a waxy character." Pl. Mem. of Law In support of Pl. Mot. for Summary Judgment (Pl. SJ. Mot.) at 8. Note 5, however, does not foreclose the possibility that other defining clarifications could exist, such as those set forth in EN 34.04. *See, e.g.*, *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017) ("'After consulting the headings and relevant section or chapter notes' consistent with GRI 1, we may consider the Explanatory Notes ('EN') attendant to the relevant HTSUS headings." (quoting *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008)). Indeed, the note uses the words "wax" or "waxy character" to describe categories of items that fall within the statutory phrase "artificial waxes and prepared waxes." In doing so, it does not address a vital step in the analysis – setting forth what can be considered a "wax" under the HTSUS, or relatedly, what a "waxy character" entails.[2]

[2] Plaintiff references the deposition of Nicholas Horne, the government's Rule 30(b)(6) witness, to support its legal conclusion that the subject merchandise is classified in heading 3404. Pl. Mem. of Law in Responst to Def. Cross-Mot. for Summary Judgment and Reply to Def. Opp'n to Pl's Mot. for Summary Judgment (Pl. Reply Brief) at 7. Although we disagree with Plaintiff's characterization of Mr. Horne's testimony, it has little legal significance in this Court's *de novo* review of the classification determination. 28 U.S.C. § 2640(a); *Lanxess Corp. v. United States*, 838 F. Supp. 3d 1377, 1385 (Ct. Int'l Trade 2026). And, Mr. Horne's statement that the merchandise is an "artificial waxy solid" is not dispositive as to whether the subject PTMEG 2000 meets the requirements of heading 3404, as interpreted in accordance with the chapter notes and EN 34.04.

It is necessary, in the first instance, to look at dictionary definitions of the statutory terms to ascertain their common meaning. *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (citation omitted) ("To discern the common meaning of a tariff term, we may consult dictionaries, scientific authorities, and other reliable information sources."). Common definitions of "wax" are uniformly broad, encompassing both natural and synthetic substances. For example, "wax" is described by the Collins Dictionary as "a solid, slightly shiny substance made of fat or oil that is used to make candles and polish. It *melts* when it is heated." *Wax*, COLLINS ENGLISH DICTIONARY.[3] Similarly, the online version of *Encyclopedia Britannica*, *Britannica.com*, defines "wax" as "any of a class of pliable substances of animal, plant, mineral, or synthetic origin that differ from fats in being less greasy, harder, and more brittle and in containing principally compounds of high molecular weight (e.g., fatty acids, alcohols, and saturated hydrocarbons)." The *Britannica* definition goes on to identify "certain characteristic physical properties," including that they "melt at moderate temperatures (i.e., between about 35° and 100° C, or 95° and 212° F) and form hard films that can be polished to a high gloss." *Wax*, BRITANNICA[4]; *see also The Randomhouse College Dictionary* at 1489 (Revised Ed., 1982) (defining "wax" as 1 . . . a solid, yellowish substance secreted by bees, plastic when warm and melting at about 145 F . . . 3. Any of a group of substances composed of hydrocarbons, alcohols, fatty acids, and esters that are solid *at ordinary temperatures* . . . .") (emphasis added). Finally, case law cited in the opening brief, *Adolph Hurst & Co. v. United States*, 33 CCPA 96, 102 (C.C.P.A. 1946), also references the melting point in discussing the physical characteristics of wax.

---

[3] Available at https://www.collinsdictionary.com/dictionary/english/wax (last visited November 20, 2026) (emphasis added).
[4] Available at https://www.britannica.com/technology/wax (last visited November 20, 2026).

As noted, these definitions often reference natural and artificial waxes, which may have different properties. An often-cited physical characteristic shared by many waxes, however, relates to how they transform from a solid to a liquid state. *See, e.g.*, *Beeswax*, BRITANNICA;[5] *Paraffin wax*, BRITANNICA.[6] Although this transformation is frequently referred to as "melting," many waxes do not have a true melting point, but rather, a "dropping" point, measurable by laboratory instruments. Govt. Exh. 8, ASTM D3954-15 Standard Test Method for Dropping Point of Waxes at, ¶ 4.1 (explanation of relevance of dropping point); *"What is Dropping Point? What is Softening Point?,"* METTLER TOLEDO,[7] *see also* Def. Exh. 4 (Deposition of Dr. Hermenegildo Pedrosa (Pedrosa Dep.)) at 11:17-12:6.

EN 34.04, therefore, provides further (and necessary) guidance related to the physical characteristics of the particular waxes that fall within the statutory term "artificial waxes." As described in our opening brief, EN 34.04 provides that artificial waxes under heading 3404 must, among other things, have a "dropping point of above 40 C." Def. MSJ at 10-11; Govt. Exh. 1, EN 34.04. Mettler Toledo, a global leader in developing the measuring instruments used in this analysis, defines "dropping point" as "the specific temperature at which a liquefied substance first drops from a standardized, chromium-plated cup into collector glass. This measurement is essential for ensuring consistency and reliability in the quality assessment of various waxes, including paraffin, microcrystalline polyethylene, and oxidized Fischer-Tropsch waxes." *Dropping Point Determination of Wax*, METTLER TOLEDO.[8] The EN, therefore, clarifies the

---

[5] Available at https://www.britannica.com/topic/beeswax (last updated November 4, 2026).
[6] Available at https://www.britannica.com/science/paraffin-wax (last updated November 4, 2026).
[7] Available at https://www.mt.com/us/en/home/applications/Application_Browse Laboratory_Analytics/Thermal_Values/dropping-point-determination.html (last visited November 19, 2026).
[8] Available at https://www.mt.com/int/fr/home/library/applications/lab-analytical-instruments/dropping-point-of-wax.html (last visited November 19, 2026).

physical attributes of "artificial waxes" of heading 3404, which, although consistent with the common meaning of the term, are not expressly set forth in the statute.

As we noted in our opening brief, this Court, and the U.S. Court of Appeals for the Federal Circuit have routinely turned to the ENs for interpretive guidance, where, like here, the chapter notes leave heading terms undefined. *See, e.g.*, *Lemans Corp v. United States*, 660 F.3d 1311, 1319-21 (Fed. Cir. 2011); *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006); *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011).

Relying on EN 34.04 to provide guidance in interpreting the term "artificial wax" in heading 3404 is consistent with the application of ENs in other similar circumstances. For example, in *StoreWALL*, the Federal Circuit analyzed whether imports of wall panels and locator tabs were properly classifiable as "unit furniture" under heading 9403, HTSUS. *StoreWALL LLC*, 644 F.3d at 1360. Like here, while the chapter notes contained some details about the categories of merchandise that fall within the undefined tariff term, the Court consulted the ENs for more precise guidance. *See id*. at 1360-63. Specifically, the Federal Circuit noted that it was appropriate for this Court to add the "rack exclusion' identified in the Explanatory Notes into its definition of 'unit furniture.'" In doing so, the *StoreWALL* Court noted that this analysis did "not contradict the common commercial meaning of 'unit furniture,' but instead clarifie[d] the scope of the term." *Id.*; *see also Degussa Corp. v. United States*, 508 F.3d 1044, 1048 (Fed. Cir. 2007) (noting that "we did not hold . . that an explanatory note cannot define a term in a way that might narrow the plausible interpretation of a chapter note or heading."). The same is true here.

Plaintiff cites, instead, to *Archer Daniels Midland Co. v. United States*, 561 F.3d 1308 (Fed. Cir. 2009) for its assertion that this Court should disregard the ENs here. However, *Archer Daniels* is inapposite. The *Archer Daniels* Court describes a circumstance where an EN goes too

far in its attempt to limit the tariff provision. *Id*. at 1315. Specifically in *Archer Daniels*, the Federal Circuit found that the relevant EN improperly limited the meaning of a basket provision covering “residual products” to only cover four or five products, which is inconsistent with the purpose of a basket provision, and contradicts the “ordinary meaning of the term ‘residual products.’” *Id*. at 1314-15. Unlike the EN at issue in *Archer Daniels*, EN 34.04 is not an improper limitation on the language of a basket provision, nor does it contradict the plain meaning of the heading term. Instead, EN 34.04 provides specific and needed guidance to consider when analyzing whether products that may be wax-like or “of a waxy character,” are “artificial waxes” within the meaning of the tariff term. The EN does so in a manner that is consistent with the language of the HTSUS (including the chapter notes). *See StoreWALL LLC*, 644 F.3d at 1363; *see also* EN 34.04.

As a means of determining whether the merchandise could be classified in heading 3404, CBP measured the dropping point of a sample of the subject PTMEG 2000. Def. MSJ at 14-16; Govt. Exh. 3, CBP Lab Report # NY20190338. CBP used ASTM D3954, an internationally recognized test for determining the dropping point of wax (adopted by the agency as CBP Laboratory (“CBPL”) Method 34-05), to analyze the sample. *Id*. As set forth in our opening brief, the CBP Laboratory determined that the dropping point of the subject PTMEG 2000 was *below* 40 °C. *Id*. Therefore, CBP concluded that the subject merchandise cannot be classified as an “artificial wax” of heading 3404, HTSUS, or under Plaintiff’s claimed subheading 3404.90.51, HTSUS.

## II. Plaintiff’s Testing Of The Subject Merchandise Should Be Excluded Because Plaintiff’s Expert Used A Now Defunct Testing Method

In the course of determining what characteristics PTMEG 2000 exhibits, the parties have discussed two different ASTM[9] tests that were performed to measure the dropping point of the subject merchandise. CBP administered ASTM D3954/CBPL 34-05, as discussed above. As set forth in our opening brief, Plaintiff's expert applied ASTM D566, a test originally identified as a method for testing the dropping point for lubricating grease (not wax), and that has since been withdrawn by ASTM. Therefore, the evaluation of Plaintiff's expert does not withstand scrutiny under the gate-keeping *Daubert* analysis and should be disregarded. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 593-94 (1993); Def. MSJ at 16-20.

"The *Daubert* factors are not exhaustive nor always all relevant to an issue but include assessing: (1) the testability of a given methodology, (2) whether the methodology has been subject to peer review and publication, (3) the known or potential error rate, and (4) acceptance in the scientific community." *New Image Global Inc., v. United States*, 399 F. Supp. 3d 1257, 1268 (Ct. Int'l Trade. 2019) (quoting *Libas, Ltd. v. United States*, 193 F.3d 1361, 1367 (Fed. Cir. 1999). When a *Daubert* challenge is presented as part of a motion for summary judgment, the Court, as gatekeeper, decides that "for an expert witness's testimony to be admissible, it must be reliable, relevant, and *helpful* to the trier of fact." *See, e.g.*, *Rubies Costume Co. v United States*, 279 F. Supp. 3d 1145, 1162 (Ct. Int'l Trade 2017) (quoting *G.G. Marck & Associates, Inc. v. United States*, 2015 WL 3757040, at *9 (Ct. Int'l Trade June 17, 2015) (emphasis added).

As explained in Defendant's opening brief, the test method used by Dr. Lanning, ASTM D566, has been withdrawn, and is, therefore, no longer accepted by the scientific community. *See* ASTM D566-20, Standard Test Method for Dropping Point of Lubricating Grease

---

[9] ASTM is an entity that develops internationally recognized scientific testing methods. *See ASTM*, https://www.astm.org/ (last visited November 20, 2026).

(Withdrawn 2023).[10] And, Dr. Lanning was not able to perform the test conducted by the CBP Laboratory, ASTM D3954, which is used to determine the dropping point of wax. *See* Ahlemeyer Decl. at ¶ 8. Because Dr. Lanning has applied a since-withdrawn test, intended to test a different substance, its application is not *helpful* to the trier of fact in determining the dropping point of the merchandise at issue. Therefore, Dr. Lanning's opinions and conclusions should be disregarded.

**III. The Court Can Consider The Declaration Of Dr. Ahlemeyer**

Contrary to Plaintiff's assertions, the Court can, and should, consider the declaration of Dr. Ahlemeyer in reviewing the summary judgment submissions. Plaintiff contends that the opinions in paragraphs five through eight of Dr. Ahlemeyer's are "new opinions" and thus violate USCIT Rule 26(a). Pl. Reply Brief at 8-11.[11] For several reasons, Plaintiff is wrong.

First, Plaintiff takes issue with Dr. Ahlemeyer's assertions, in paragraph five of the declaration, that ASTM D3954 is a widely accepted, dropping point test method, and is offered by many testing laboratories. Pl. Reply Brief at 11. This is not an opinion, but a fact. The widespread acceptability of ASTM D3954 is not in dispute here, nor has Plaintiff attempted to refute its validity. And, Dr. Ahlemeyer's citations to publicly available sources provide independent evidence supporting the factual assertion in paragraph five of the declaration – that ASTM D3954 is widely accepted. Ahlemeyer Decl. at ¶ 5, n,1.

Next, Plaintiff alleges that the statements in paragraphs seven and eight of Dr. Ahlemeyer's declaration, regarding the superior precision measurements provided by ASTM D3954 and the discrepancies between the testing conducted by the CBPL and Plaintiff, are new

---

[10] Available at https://store.astm.org/d0566-20.html (last visited November 20, 2026).

[11] Here, the government, like Plaintiff, has submitted an affidavit from its expert in support of its motion for summary judgment. *Compare* Dkt. No. 39-5 (Decl. of Dr. Wade Lanning) with Dkt. No. 47-5 (Decl. of Dr. Nicholas Ahlemeyer) (Govt. Exh. 2).

opinions. Pl. Reply. Brief at 11. However, these statements are simply a rehash of the opinions previously disclosed in Dr. Ahlemeyer's December 6, 2024 expert report. *See* Govt. Exh. 11, Expert Report of Nicholas Ahlemeyer, Ph.D. (December 6, 2024). For example, in paragraphs four and six of Dr. Ahlemeyer's expert report, he similarly discusses the superior precision of ASTM D3954 due, in part, to its automatic reading capability. *Id.* at ¶¶ 4,6. And, Dr. Ahlemeyer's identification of the flaws in Plaintiff's testing of the merchandise expressed in paragraph eight of his declaration originated from paragraphs five through eight of his expert opinion. *Id*. at ¶ 8.

Lastly, Plaintiff contends that the entirety of paragraph six of Dr. Ahlemeyer's affidavit, regarding the withdrawal of ASTM D566, constitutes a new expert opinion. Pl. Reply Brief at 10-11. However, as Dr. Ahlemeyer notes in this paragraph, ASTM D566 was withdrawn on March 8, 2023, a fact that is publicly available on the ASTM website. *See* ASTM D566-20, Standard Test Method for Dropping Point of Lubricating Grease (Withdrawn 2023);[12] *see also* ASTM D2265-22, Standard Test Method for Dropping Point of Lubricating Grease Over Wide Temperature Range (replacing ASTM D566).[13] And, Dr. Ahlemeyer's inferences as to the potential reasons for withdrawal also come from publicly available sources cited in his affidavit.[14]

---

[12] *Available at* https://store.astm.org/d0566-20.html.
[13] *Available at* https://store.astm.org/d2265-22.html.
[14] *See* Dallas Laboratories, Inc., Liquid Fuel and Petroleum Product Testing, https://dallaslaboratories.net/fuels-crude-petroleum (last visited November 20, 2026) (utilizing ASTM D3954 as Dropping Point test for wax); Canoil Canada Ltd., *TECHNICAL NOTE: GREASE DROPPING POINT*, https://canoilcanadaltd.com/wp-content/uploads/2019/01/Dropping-Point-Tests.pdf (last visited November 20, 2026) (explaining use of D2265 over D566 because "D566 has slightly worse reproducibility").

Even if the Court were to find that these paragraphs constitute "new" opinions, which they do not, Dr. Ahlemeyer's declaration should not be excluded. Indeed, Rule 37 affords the Court the discretion to admit information not previously provided or identified under Rule 26(a), so long as the failure to include this information "was substantially justified or is harmless." USCIT Rule 37 (c)(1); *Cozy Comfort Company, LLC v. United States*, Court No. 22-00173 2024 WL 4491607, at *10 n.2 (Ct. Int'l Trade. Oct. 15, 2024) (noting that court found late disclosure of a patent admissible "even though Cozy Comfort did not produce it during discovery because Cozy Comfort's failure to produce the patent was harmless."). A late admission is harmless "when there is no prejudice to the party entitled to the disclosure." *Warner-Lambert Co. v. United States*., 341 F. Supp. 2d 1272, 1278 n.7 (Ct. Int'l Trade 2004) (quoting *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co*., 297 F.Supp.2d 463, 481 (N.D.N.Y. 2003). Plaintiff is not prejudiced by the disclosure of the fact that the testing method applied by its expert has been withdrawn. Moreover, the Government does not believe Plaintiff would need to further question Dr. Ahlemeyer, Pl. Reply Br. at 10, but would consent to a request by Plaintiff to re-open discovery for that purpose. Therefore, should the Court find that paragraphs five and six of Dr. Ahlemeyer's affidavit constitute new opinions, the inclusion of those paragraphs is substantially justified and harmless and therefore, these opinions are admissible.

## IV. PTMEG 2000 Is Properly Classified Under HTSUS Subheading 3907.20.00 Because It Is An Other Polyether In Primary Form

As noted in Defendant's opening brief, the merchandise is properly classified in subheading 3907.20.00, HTSUS, as "other polyethers . . . in primary forms." Def. MSJ at 21-24. Plaintiff does not, however, consider whether the subject merchandise is a "polyether" or whether it is "in [a] primary form[]," arguing instead that since "the subject merchandise is an artificial wax, Defendant's claimed classification heading 3907, HTSUS, must fall by operation

of Note 2(b) to Chapter 39, HTSUS, which provides that Chapter 39 does not cover [w]axes of heading 2712 or 3404." Pl. Reply Brief at 16-17 (internal quotations omitted). The Government agrees that *if* the merchandise were classifiable in heading 3404, Note 2(b) to Chapter 39 would preclude its classification in Chapter 39. However, because, as set forth above, the subject merchandise is not classifiable in heading 3404, analysis of heading 3907 is warranted. The subject merchandise plainly satisfies the terms of subheading 3907.20.00, HTSUS, and the classification in that subheading is appropriate.

To summarize, a "polyether[]", which is undefined in the tariff, is, according to scientific literature, a polymer (a chemical substance composed of large, or "macro" molecules) "containing ether linkages in the backbone." *Polyether*, INT'L UNION OF PURE & APPLIED CHEM. (IUPAC) GOLD BOOK, https://doi.org/10.1351/goldbook.15279 (last visited November 20, 2026). Plaintiff's own description satisfies that definition. Indeed, Plaintiff describes the merchandise as "a *polymer* of tetrahydrofuran" that "are linear, polymeric, primary diols with repeating (C4H8O) units *in the backbone*." Govt. Exh. 7, Pl. Resp. Def's Interrogatory No. 4, (emphasis added). Further, a "tetrahydrofuran" is a "flammable liquid heterocyclic *ether* C4H8O that is derived from furan and used as a solvent and as an intermediate organic synthesis." *Tetrahydrofuran,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/tetrahydrofuran (last visited November 19, 2026) (emphasis added). That the subject merchandise is a "polyether" is further supported by the language in EN 39.07, which describes "other polyethers" as "Polymers obtained from epoxides, glycols or similar materials and characterized by the presence of ether-functions in the polymer chain." EN 39.07, Govt. Exh. 10.

In addition, there is no question that the polyether is in a "primary form." Note 6(b) to Chapter 39 defines "primary forms" to include "blocks of irregular shape, lumps, powders (including molding powders), granules, flakes and similar bulk forms." Chapter 39, Note 6(b). The sample of the subject merchandise submitted by Plaintiff can be described in its primary form as a "shape," "lump," or "similar bulk form." *See* Notice of Manual Filing, Dkt. No. 8. Therefore, as stated in the Government's opening brief, and herein, the subject merchandise is classifiable under subheading 3907.20.00, HTSUS. Def. MSJ at 21-24.

Plaintiff's lone attempt to challenge this classification is by analogizing PTMEG 2000 to a different chemical product, polyethylene glycol (PEG), which is identified in EN 39.07 as being classifiable in that heading. *Id*. at 17-18. In support of this analogy, Plaintiff attempts to discredit EN 39.07, which states that PEGs are classifiable in heading 3907 because, Plaintiff states, PEG "when entered in waxy form, is specifically provided for in subheading 3404.20.00, HTSUS." *Id*. at 17.

Plaintiff's analogy is wrong. Under GRI 1, Courts construe the language of the heading first, without reference to the subheading. *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998); *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014) ("Pursuant to GRI 1, the possible headings are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings"). As a threshold matter, therefore, Plaintiff may not rely on a term or example that appears only in a subordinate, eight-digit subheading to interpret the language of the four-digit heading. The relevant legal question depends on comparing the language of heading 3404 ("artificial waxes") to the language of heading 3907 ("other polyethers … in primary forms"). Here, as set forth above, the merchandise at issue—PTMEG 2000—is not described by the term "artificial waxes."

Moreover, even were the Court to consider the classification of PEG products as a possible comparison to the facts of this case, Plaintiff's logic ignores the interplay between heading 3404 and heading 3907 and the fact that different items identified as "PEG" or "PTMEG" can be classified in different headings. For example, *some* forms of PEG products can be classified under Chapter 39 (those not having the character of waxes), while artificial waxes of PEG are excluded from heading 3907, and instead classified under Chapter 34. *See* EN 34.04 ("[a]part from the exclusions mentioned above, the heading **does not cover** : (h) Poly(oxyethylene) (polyethylene glycol) not having the character of waxes (e.g., **heading 38.24** or **39.07**).") (emphasis added). Comparable variations exist with regard to PTMEG products; not every "version" of PTMEG is the same as the subject merchandise, and classification is dependent on the precise merchandise at issue.[15] Therefore, the critical consideration is whether the subject merchandise, PTMEG 2000, is an "artificial wax," which, as already stated above, it is not.

In sum, PTMEG 2000 is not classifiable as an artificial wax under heading 3404, HTSUS, and is properly classifiable as an "other polyether{}… in primary form{}" under subheading 3907.20.00, HTSUS (2019).

---

[15] *See, e.g.*, *PTMEG 0220*, GANTRADE, https://www.gantrade.com/products/ptmeg-0220 (last visited November 20, 2026).

**CONCLUSION**

For these reasons, Defendant respectfully requests that the Court deny Plaintiff's motion for summary judgment and grant the Government's Cross-Motion for Summary Judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

MONICA P. TRIANA
Assistant Director

OF COUNSEL

Emma Tiner
Attorney
U.S. Customs and Border Protection
Office of Chief Counsel
International Trade Litigation

By: /s/ Adam A. Vischio
ADAM A. VISCHIO
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, NY 10278
(202) 305-5528
*Attorneys for Defendant*

Dated: November 20, 2026

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing submission complies with the word-limitation set forth in the Standard Chambers Procedure 2(B)(1), and contains 5,162 words.

Dated: November 20, 2026

/s/ Adam A. Vischio
Adam Angelo Vischio